### NATIONAL LABOR RELATIONS BOARD v. HIGHLAND PARK MFG. CO.

No. 6082.

United States Court of Appeals
Fourth Circuit.

Argued June 13, 1950.

Decided Sept. 2, 1950.

Frederick U. Reel, Attorney, National Labor Relations Board, Washington, D. C. (David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General Counsel, Marcel Mallet-Prevost and Samuel M. Singer, Attorneys, National Labor Relations Board, all of Washington, D. C., on brief), for petitioner.

Whiteford S. Blakeney, Charlotte, N. C. (Pierce & Blakeney, Charlotte, N. C., on brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is a petition to enforce an order of the National Labor Relations Board which directed the Highland Park Manufacturing Co. at its Rock Hill, S. C., plant to bargain with the Textile Workers Union of America, affiliated with the C.I.O., as the bargaining agent of its employees. Question is raised as to whether the union obtained a majority vote in the election held to determine the bargaining representative, but we need not go into this, as we think that the Board proceeded upon an erroneous theory of law in ordering the company to bargain with the T.W.U.A. upon its petition, when that union at the time was affiliated with the C.I.O., whose officers had not then complied with the statute requiring the filing of non-Communist affidavits. The Board applied the rule which it had laid down, contrary to the opinion of general counsel and with one member dissenting, in Matter of Northern Virginia Broadcasters, 75 N.L.R.B. 11. The question presented here is identical with that before the Court of Appeals of the Fifth Circuit in N.L.R.B. v. Postex Cotton Mills, 5 Cir., 181 F.2d 919, which involved the application of the same rule; and we agree with the decision of that court reversing the action of the Board for the reasons set forth in the comprehensive and able opinion of Judge Russell.

We find no ambiguity in the language of the governing statute. On the contrary it provides as clearly as language can that the power of the Board may not be invoked by a labor organization unless there is on file the affidavits which the statute requires executed "by each officer of such labor organization and the officers of any national or international labor organization of which it is an affiliate or constituent unit".[1] The C.I.O. is unquestionably a national labor organization and the T.W. U.A. is admittedly affiliated with it. The argument of the Board that filing is required only of the officers of an organization of which the bargaining union is a constituent and subordinate unit is negatived by the language which requires filing by the officers of the international organization of which the bargaining union is "an affiliate" as well as where it is a "constituent unit".

As there is no ambiguity in the language of the statute, there is no occasion to resort to the rules of construction; but, if resort be had to these, the result is the same. The reason and purpose of the provision was to eliminate communists and others seeking the overthrow of the government by force from positions in which they would be able to use the power of labor organization, which the statute was fostering, in the aid of political strikes and other dangerous disruptions of industry. As to this, Chief Justice Vinson in the recent case of American Communications Ass'n, C.I.O. v. Douds, 339 U.S. 382, 70 S.Ct. 674, 678, said:

"The constitutional justification for the National Labor Relations Act was the power of Congress to protect interstate commerce by removing obstructions to the free flow of commerce. National Labor Relations Board v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. That Act was designed to remove obstructions caused by strikes and other forms of industrial unrest, which Congress found were attributable to the inequality of bargaining power between unorganized employees and their employers. It did so by strengthening employee groups, by restraining certain employer practices, and by encouraging the processes of collective bargaining.

"When the Labor-Management Relations Act was passed twelve years later, it was the view of Congress that additional impediments to the free flow of commerce made amendment of the original Act desirable. * * *

"One such obstruction, which it was the purpose of § 9(h) of the Act to remove, was the so-called 'political strike.' Substantial amounts of evidence were presented to various committees of Congress, including the committees immediately concerned with labor legislation, that Communist leaders of labor unions had in the past and would continue in the future to subordinate legitimate trade union objectives to obstructive strikes when dictated by Party leaders, often in support of the policies of a foreign government. And other evidence supports the view that some union leaders who hold to a belief in violent over-

1. The statute is as follows: "No investigation shall be made by the Board of any question affecting commerce concerning the representation of employees, raised by a labor organization under subsection (c) of this section, no petition under subsection (e) (1) of this section shall be entertained, and no complaint shall be issued pursuant to a charge made by a labor organization under subsection (b) of section 160 of this title, unless there is on file with the Board an affidavit executed contemporaneously or within the preceding twelve-month period by each officer of such labor organization and the officers of any national or international labor organization of which it is an affiliate or constituent unit that he is not a member of the Communist Party or affiliated with such party, and that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods. The provisions of sections 286, 287, 1001, 1022, and 1023 of Title 18 shall be applicable in respect to such affidavits." Sec. 9 (h), Labor Management Relations Act, 61 Stat. 146, 29 U.S.C.A. § 159(h).

throw of the Government for reasons other than loyalty to the Communist Party likewise regard strikes and other forms of direct action designed to serve ultimate revolutionary goals as the primary objectives of labor unions which they control. * * *

"It is sufficient to say that Congress had a great mass of material before it which tended to show that Communists and others proscribed by the statute had infiltrated union organizations not to support and further trade union objectives, including the advocacy of change by democratic methods, but to make them a device by which commerce and industry might be disrupted when the dictates of political policy required such action.".

Mr. Justice Jackson, in his concurring opinion in the Douds case, had this to say, as to the reason and purpose of the statutory provision:

"The Communist Party * * * is not primarily interested in labor's vote, for it does not expect to win by votes. It strives for control of labor's coercive power—the strike, the sit-down, the slow-down, sabotage, or other means of producing industrial paralysis. Congress has legalized the strike as labor's weapon for improving its own lot. But where Communists have labor control, the strike can be and sometimes is perverted to a party weapon. In 1940 and 1941, undisclosed Communists used their labor offices to sabotage this Nation's effort to rebuild its own defenses. * * *

"This labor leverage, however, usually can be obtained only by concealing the Communist tie from the union membership. Whatever grievances American workmen may have with American employers, they are too intelligent and informed to seek a remedy through a Communist Party which defends Soviet conscription of labor, forced labor camps and the police state. Hence the resort to concealment, and hence the resentment of laws to compel disclosure of Communist Party ties. The membership is not likely to entrust its bargaining power, its records, and its treasury to such hands. When it does, the union finds itself a more or less helpless captive of the Communist Party. Its officers cease to be interested in correcting grievances but seek to worsen and exploit them; they care less for winning strikes than that they be long, bitter and disruptive. They always follow the Communist Party line, without even knowing its source or its objectives. The most promising course of the Communist Party has been the undercover capture of the coercive power of strategic labor unions as a leverage to magnify its power over the American people."

In the light of this purpose, it is perfectly clear that it is much more important to exclude communists and others plotting the overthrow of the government by force from holding office in the great national labor organizations such as the C.I.O. and the A.F.L. than to exclude them from office holding in their affiliates; and it is not reasonable to suppose that Congress did not intend the officers of the former to be covered by its provisions. It is true that it is the officers of the affiliates who call the strikes; but it is the officers of the national or parent organizations who shape labor policies that cause the strikes to be called, and this is particularly true of general strikes or strikes having a political purpose. As was well said by Member Gray in his dissenting opinion in Northern Virginia Broadcasters, supra:

"The officers of the A.F.L. and the C.I.O. have been recognized as the spokesmen and representatives of organized labor in this country. It was the A.F.L. Executive Council which recommended on December 15, 1941, that 'a no-strike policy shall be applied in all war and defense * * * industries.' On the following day, the conference of A.F.L. presidents adopted this recommendation.

"The extent of the influence wielded by the A.F.L. is also apparent from the control which it exercises over the 'jurisdiction' of its member unions. Awards of the governing body may be subject to enforcement through expulsion from the organization. Conversely, the member unions exercise a measure of control over their parent organization through the election of its officers.

"It is therefore apparent that the A.F.L. may exercise direct and influential con-

trol over its constituent unions in important respects and that A.F.L. officers occupy a strategic position to affect the economic life of the Nation. Under these circumstances, it is inconceivable that Congress was not concerned with the Communist affiliation of the officers of the A.F.L. and C.I.O. in accomplishing its intended purpose of purging labor of Communist influence."

We have carefully considered the argument to the contrary in the majority opinion in West Texas Utilities Co. v. N.L.R.B. D.C.Cir., 184 F.2d 233; but, with due respect, we are not convinced by it. We agree with the statement of Judge Russell in the Postex case, supra, that the Congressional purpose was to "wholly eradicate and bar from leadership in the American labor movement, at each and every level, adherents to the Communist party and believers in the unconstitutional overthrow of our Government". [181 F.2d 920.] "If the statute is construed in accordance with its express language to deny governmental support to unions that are affiliated with national organizations which refuse to comply with its anti-Communist provisions, the result will be either that the national organizations will comply with the statute, or that they will be segregated from the effective body of loyal American labor by the withdrawal of their affiliates. In either event, the labor movement will be effectively protected from the danger of Communist leadership in the formulation of labor policies; and this is evidently the end to which the legislation was directed. We see no occasion to emasculate the statute by resorting to forced rules of interpretation when its language is perfectly clear and gives unqualified support to the purpose which Congress had in mind. The office of interpretation is to resolve ambiguities, not to create them.

Nothing contrary to our decision here was decided in N.L.R.B. v. Harris-Woodson Co., 4 Cir., 179 F.2d 720, since in that case the question now before us was not raised. It was assumed in that case on all sides that the filing by the officers of the T.W.U.A. was a sufficient compliance with the statute and the only question was whether the bargaining union could avail itself of the change of affiliation which had taken place.

For the reasons stated, enforcement of the Board's order will be denied and the order will be set aside.

Enforcement denied.