## W. T. RAWLEIGH CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 10300.

United States Court of Appeals
Seventh Circuit.

July 9, 1951.

---

Everett E. Laughlin, Freeport, Ill., Howard P. Robinson, Arthur R. Seder, Jr., Chicago, Ill., Laughlin & Laughlin, Freeport, Ill. (Sidley, Austin, Burgess & Smith, Chicago, Ill., of Counsel), for petitioner.

David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Bernard Dunau, Atty., George J. Bott, Gen. Counsel, Marshall J. Seidman, Atty., N.L.R.B., all of Washington; D. C., for respondent.

Before MAJOR, Chief Judge, and FINNEGAN and SWAIM, Circuit Judges.

FINNEGAN, Circuit Judge.

In this proceeding The W. T. Rawleigh Company seeks review of a decision and order of the National Labor Relations Board, entered on August 17, 1950, requiring petitioner: (1) to cease and desist from discouraging membership in or discriminating against The Warehouse and Distribution Workers' Union, International Longshoremen's and Warehousemen's Union, or any other labor organization; (2) to offer immediate reinstatement, with back pay from December 22, 1947, to 45 named employees; and (3) to post prescribed notices in its plant for thirty days.

It appears that the petitioner is an Illinois corporation having its main office and plant at Freeport, Illinois. It is engaged in the manufacture and sale of medicines, insecticides, food products, soups, poultry preparations, and other similar products, and employed about 366 production employees in October of 1947.

The present controversy arose out of a strike at petitioner's plant in Freeport, Illinois, in the months of November and December, 1947. For several years prior to that time petitioner's production employees were represented for collective

bargaining purposes by Warehouse and Distribution Workers' Union, International Longshoremen's and Warehousemen's Union, hereinafter referred to as the Union. The officers of petitioner and the officials of the Union met and conferred five or six times during October of 1947, in order to negotiate a new contract to replace an agreement which was to expire on October 31, 1947. The meetings were unsuccessful, the negotiators were unable to agree concerning a check-off clause demanded by the Union, and were also unable to reach agreement as to the amount of a proposed wage increase. It is conceded that the Union was not in compliance with section 9(f) and (g) regarding financial reporting requirements, and that its officers did not sign noncommunist affidavits as required by section 9(h) of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 159 (f-h).

Following the failure of the negotiations for a new contract, a strike was called by the members of the Union at a meeting held on October 31, 1947. In its inception the strike was economic and the trial examiner so found. However, both the examiner and the Board concluded that the unfair labor practices of the petitioner converted the strike from an economic strike into an "unfair labor practice" strike. The strike ended on or about December 22, 1947.

Following the termination of the strike, 54 former employees of petitioner filed an unfair labor practice charge with the National Labor Relations Board. An amended charge was filed on January 28, 1948, and more than a year later on February 25, 1949, a complaint was issued by the general counsel on behalf of the Board.

The complaint alleges that petitioner violated section 8(a) (3) of the Labor Management Relations Act, 29 U.S.C.A. § 158 (a) (3), by discharging the 54 associated complainants at various times during the course of the strike; that it violated the Act by refusing to reinstate the complainants, and by conditioning their reinstatement upon a "coercive individual interview with each employee." It is also charged that certain acts of the petitioner violated section 8(a) (1) of the Act by interfering with, restraining and coercing employees in the exercise of the rights guaranteed them by section 7 of the Act, 29 U.S.C.A. § 157.

Paragraph 4 of the complaint states "that the complaint is not to be construed to suggest that the respondent (meaning the petitioner) has any duty to bargain with I. L. W. U. (meaning the Union) in view of its failure to comply with section 9(h) of the Act."

In its answer and amended answer, the petitioner denied all the material allegations of the complaint. It alleged: (1) that the 54 complainants named either terminated their employment voluntarily or were discharged for cause; (2) that during the course of the strike the strikers engaged in unlawful conduct which made it necessary for petitioner to seek and to obtain a temporary injunction prohibiting such unlawful acts and conduct, and that the injunction so obtained was amended by the court issuing it so as to enjoin further unlawful conduct; and (3) that the petitioner had on two occasions, on December 5 and 9, 1947, offered to reinstate all but two striking employees.

After an extended hearing the trial examiner, on November 30, 1949, filed his intermediate report and recommended order. In his report he concluded that the petitioner had interfered with, restrained and coerced its employees in the exercise of their rights under section 7 of the Act by threatening discharge for striking, both before and during the strike, and by requiring abandonment of membership in the Union; by requiring individual interviews, and insisting that one of the employees, Burns, be excluded, as a condition of returning to work. He also found that petitioner had caused the arrest of certain of its employees on false charges.

The intermediate report further found that petitioner had discharged 46 of the complaining employees because of their union activities, and had refused to reinstate eight of the complainants "except upon discriminatory conditions because of their union activities."

The trial examiner, in his intermediate report, denied petitioner's contention that complaining employees had forfeited their rights to reinstatement because they had engaged in mass picketing, in violence and in the prevention of attempts of non-striking employees to go to work, and in interfering with railroad and truck movements to and from petitioner's plant, and in other acts of coercion violative of section 8(b) (1) (a) of the Act. He did, however, find that seven of the complainants had physically assaulted or blocked non-striking employees from entering petitioner's plant in one or the other of picket line incidents. He denied reinstatement to each of these employees. He further found that one complaining employee had returned to work voluntarily, prior to the termination of the strike, and that another had been discharged for reasons other than union activities, and as to them, recommended no order for reinstatement or for back pay.

Both respondent and the general counsel of the Board filed exceptions to the intermediate report. The Board thereupon reviewed the proceedings and found that no prejudicial error was committed. The rulings of the trial examiner were affirmed, and his findings, conclusions and recommendations, with some additions and modifications, were adopted.

Thereupon, The W. T. Rawleigh Company filed the petition now before us to review the order of the National Labor Relations Board.

In the brief filed in support if its petition, The W. T. Rawleigh Company states that it has concluded, without in any way conceding that the Board's decision was justifiable, that its own best interests will be served by foregoing argument on the question as to whether or not it engaged in unfair labor practices. It does, however, insist that the name of the non-complying Union, Warehouse and Distribution Workers' Union, International Longshoremen's and Warehousemen's Union be deleted from that portion of the Board's order, 1(a) and 1(b), which provides that the petitioner cease and desist from discouraging membership in the named Union or any other labor organization of its employees in various enumerated ways, and from in any other manner interfering with, restraining or coercing its employees in the exercise of the right of self-organization, to form labor organizations, to join or assist the named Union, or any other labor organizations."

Petitioner's contention in the non-compliance issue is based on the fact that neither the local union nor the national union involved had complied with the provisions of the Act (sec. 9(h)) which provides that no investigation shall be made and that no complaint shall be issued on a charge made by a labor organization unless there is on file with the Board an affidavit executed by each officer of the labor organization and by each officer of any national or international labor organization of which it is an affiliate or constituent unit, that he is not a member of the Communist party or affiliated therewith, and that he does not believe in or hold membership in or support any organization that believes in or teaches the overthrow of the United States government by illegal or unconstitutional methods.

Moreover, petitioner expresses great concern over that portion of the order which directs the reinstatement with back pay of 45 of the named complainants, who, petitioner claims, participated in a course of conduct which bars the remedy of reinstatement under section 10(c) of the National Labor Relations Act, 29 U.S.C.A. § 160(c).

On behalf of the Board, it is urged that the petition for review should be denied and that a decree should be entered enforcing in every respect the order of the Board. As to the non-compliance issue, it is claimed that the Union was in compliance at the time (August 17, 1950) when the order of the Board issued. On the reinstatement issue, it is contended first that the petitioner condoned the alleged wrongs of the complainants by offering to reinstate all pickets without regard to misconduct, and that the discharges of complainants were therefore based solely on discriminatory grounds. The second contention is that the strike activities of the

complainants were legitimate considered as a whole, even though some actual misconduct did occur as found by both the examiner and the Board.

We propose to consider the contentions of the respective parties on these issues in the order in which they are here set down: first, the non-compliance issue; second, the condonation issue, and lastly the reinstatement issue.

In so far as the non-compliance issue is concerned, it should be noted that in the original charge against the employer, filed on January 5, 1948, the Union is described as Local 221, Warehouse and Distribution Workers' Union, I.L.W.U.–C.I.O. In the complaint issued on behalf of the Board on February 25, 1949, and in all the subsequent findings, reports, recommendations, and orders, the reference to C.I.O. is absent when the Union is named. However, the record does show that the officers of the Union involved did not file the noncommunist affidavit required by section 9(h) of the Labor Management Relations Act.

■ As we have pointed out the complaint, filed on behalf of the Board, states that it is not to be construed to suggest that the employer had any duty to bargain with I.L.W.U. in view of the failure of this organization to comply with section 9(h). It is undisputed, on the record which we are here asked to review, that the Union was not in compliance with the requirements of the Act—and that its officers had not signed noncommunist affidavits. Moreover, the Union, as such, was not a party to this proceeding. The complaint was filed on behalf of named individuals. It cannot be inferred that the Union itself became a party to the proceeding or was entitled to any measure of relief therein because the individual complainants were members of the Union; because the Union, or its attorney, advised, counseled, and assisted in the preparation and filing of the charges or in the prosecution thereof, or because a Union official broadcast the statement that "the International Longshoremen's and Warehousemen's Union, C.I.O. intends to fight the cause of these employees all the way."

■ While this proceeding herein was under advisement, the Supreme Court on May 14, 1951, in National Labor Relations Board v. Highland Park Mfg. Co., 341 U.S. 322, 718 S.Ct. 758, rendered an opinion which affirmed National Labor Relations Board v. Highland Park Mfg. Co., 184 F.2d 98. In that case, the Court of Appeals for the Fourth Circuit approved and adopted the decision of the Court of Appeals for the Fifth Circuit in National Labor Relations Board v. Postex Cotton Mills, 181 F.2d 919, which held that the Board was not authorized to order an employer to bargain with a local union whose affiliate or parent union has not filed the requisite noncommunist affidavits provided for in the Labor Management Relations Act, notwithstanding the fact that officers of the local involved had filed the required affidavits. In the case at bar, the record discloses that neither the officers of the parent or affiliated national union, nor of the local involved have filed the required affidavits.

The brief filed on behalf of the Board states that on the date of the issuance of the order August 17, 1950, the Union was in compliance, having filed the required affidavits on March 14, 1950. On the other hand, the petitioner attaches to its reply brief a letter from the Regional Director of the Board who signed and filed the complaint which initiated this proceeding. Said letter dated April 11, 1951, states:

"Pursuant to your request today by telephone for information concerning the compliance status of any local union in Freeport, Illinois, of Warehouse and Distribution Workers' Union, International Longshoremen's and Warehousemen's Union, our current records do not show compliance for any such local union, Local No. 221 or any other.

"I note that the International of this union had been affiliated with the C.I.O. at the time of the Trial Examiner's Report, whereas our records of the International show it is not affiliated with the C.I.O.

Very truly yours,.
Ross M. Madden,
*Regional Director*."

■ Under the circumstances, in view of the contents of this record, we believe the purposes of the Act will be effectuated by excluding from the cease and desist order, as well as from the notices required to be posted pursuant to the decision of the Board, all specific reference to Warehouse and Distribution Workers' Union, International Longshoremen's and Warehousemen's Union.

■ So far as the condonation issue is concerned, it must be noted that neither the trial examiner nor the Board found that petitioner had in fact condoned the alleged misconduct of striking employees by offering to reinstate all of them without regard to their misconduct. In this respect, this proceeding here differs from National Labor Relations Board v. E. A. Laboratories, Inc., 2 Cir., 188 F.2d 885. In that case there was a specific finding of condonation.

There was no such finding here. In fact, as we have already pointed out the complaint alleged that the petitioner, its officers and agents, have as a part of a planned and continuous course of conduct, since December 22, 1947, failed and refused to reinstate such employees in their former and equivalent positions for the reason that they had joined and assisted I.L.W.U. in the said strike and activities, and for the purpose of discouraging membership in the I.L.W.U.

Furthermore, the Board found herein in paragraph 2 of its decision that two individual solicitations to return were made in a background of clear denials of employees' rights by the Rawleigh Company. "It had already threatened to discharge Union leaders if a strike was called and it had carried out that threat. Moreover, the inducements to return included substantially higher wages than those prevailing before the strike, and were coupled with an illegal threat to discharge employees if they did not return within three days. In these circumstances, and upon the entire record, we conclude that the solicitations to return to work were a part of a pattern of illegal opposition to the purposes of the Act."

The Board also finds that two unconditional offers to return to work were made on behalf of the strikers and that petitioner did not accept these offers. Instead, it demanded that the complaining employees submit to discriminatory personal interviews.

In our opinion there is in this case no ground for the application of the doctrine of condonation.

■ We come now to the reinstatement issue. It would be impossible to consider and restate in this opinion all evidence and the testimony produced at the hearing before the trial examiner. It embraces, exclusive of exhibits, more than 4,000 pages. Fortunately, there is comparatively little difference between the parties as to the factual situation presented by this evidence. They do, of course, differ as to the emphasis or stress placed on such facts and on the rules or principles of law to be applied thereto.

The strike began on November 1, 1947, and ended on or about December 22, 1947. It was declared because of the vote of the Union at a meeting held on October 31, 1947. The minutes of that meeting are in the record and disclose that a national representative of the I.L.W.U. declared "on a strike if we close the plant down close it all down with the exception of watchmen."

At the Union meeting held a few days later, November 5, another international representative said: "There is only one way we can lose this strike and we have got to keep a picket line and let no one go through." Because the plant's power house supplied heat to a number of private homes, the Union decided to allow the power house to be operated. The employees engaged in the power house were given cards signed by Union officials permitting them to pass freely through the picket line. The president of the local union testified that no one could enter the plant and go to work without such a card. During the strike the Union issued radio broadcasts—on one such program, on November 18, it was stated "There are only 300 and some Rawleigh employees and over 200 of these walked the picket lines yesterday morning." The international and local officers of the Union gave instructions to the strikers as

to their picket duties and policed those instructions. The minutes of the Union disclose that at a meeting held on November 7, the international representative declared: "We should all get out to the picket lines on these mornings." At another meeting it was urged that picket lines be kept strong at all times. As a consequence of these exhortations and the resultant activities, the president of the Union testified that he did not see any employees go to work from November 1 until toward the close of the strike. However, during November a number of employees did attempt to enter the plant for the purpose of going to work. Such attempts gave rise to incidents of force and violence. About a dozen instances are collected by petitioner in its brief to show the methods of picketing and the extent to which they went to prevent access to the plant. It would serve no useful purpose to describe such incidents in detail. Suffice it to say that the usual technique of the pickets involved consisted of marching in a circle in front of the entrance to the plant. The pickets close together, or as one witness expressed it "breast to back" circled in front of the door. Nine striking employees testified that when they tried to pass through the line they were pushed, shoved and elbowed; the trial examiner, however, invariably found in such incidents, that no physical attempt to pass the picket line had been made. Actual violence to non-striking employees, or others, trying to enter the plant did sometimes occur. In such cases the trial examiner recommended that only those who had used physical violence should be denied reinstatement. He absolved all those in the picketing force immediately allied with those using violence.

Finally, after a contested hearing lasting four days, petitioner obtained an injunction from the Circuit Court of Stephenson County, Illinois, prohibiting the Union, its officers, representatives and members from physically obstructing the entrance to the plant, from threatening or intimidating any employee seeking ingress to or egress from the plant, and from trespassing upon petitioner's property. The injunctive order issued on December 5, 1947, and thereafter the plant was reopened and non-striking employees were able to return to work when they so desired.

However, the Union and its members, on December 10, 1947, began to picket the railroad spur track of the plant, and also the entrances or doors through which truck deliveries were made. From 18 to 25 pickets formed a circle across the tracks. When the engine approached to within one or two feet of the picket line, it was stopped in order to avoid injuring anyone. On the first day, December 10, the city police were called and requested the strikers to stop picketing in front of the engine. The request was ignored, and after some hours the attempt to switch cars to or from the plant was stopped. On the next day the city police did remove the pickets from the track and switches were made. On December 15, the police again removed pickets and again a switch was made. The trial examiner found these facts but held that, since the engine did not attempt to cross the picket line, the pickets had not physically prevented the engine from moving forward.

On December 18, 1947, the Circuit Court of Stephenson County, Illinois, amended its injunctive order to restrain the Union and its members from picketing upon the railroad tracks or spurs serving the petitioner, or from interfering in the movement of any freight, express, trucking, or any other method of transportation to and from the premises of petitioner.

On or about December 19, 1947, the Union notified the petitioner that the strike was over.

Petitioner contends that the reinstatement with back pay of strikers who effectively seized its plant would not effectuate the policies of the Labor Management Relations Act. The Board contends that the order to reinstate the 45 named employees with back pay, was properly entered under the facts and circumstances disclosed.

The Board's position appears to be that no picket is guilty of misconduct unless he uses physical force or violence to prevent non-striking workers from entering the plant of the employer. Both the ex-

aminer and the Board, in instances where they deny reinstatement and back pay to offending pickets, state the finding in the following form: "It has been found that on (a given date) A. B. and C. (named picketing strikers) physically attempted to prevent employees from entering the plant. Accordingly reinstatement and back pay will not be recommended in respect to them because of participation in such conduct."

In National Labor Relations Board v. Indiana Desk Co., 149 F.2d 987, 995, this court said, where a similar situation was involved: "The undisputed evidence discloses that the picketing was not conducted for the purpose of publicizing the strike or any grievance which the strikers had against respondent, or for the purpose of persuading the non-strikers to join the strikers or to refrain from going to work during the strike. It is equally undisputed that the picketing was designed and maintained for the avowed purpose of forcibly excluding any and all employees from entering respondent's plant, and that the picketers were prepared to use any force necessary to accomplish such purpose. As stated by the trial examiner, the 'technique employed (pickets operating in a circle so near to the door of the plant that there was no room to enter) proved effective in keeping the non-striking employees out of the factory.'" (Matter in parenthesis added by us.)

In the case here under review, as in the Indiana Desk case, the record shows that the Union permitted power house employees to have access to the plant. In this case they went so far as to issue written permits so that such employees could freely cross the picket line. Here the Board contends, as it did in that case, that the actual use of physical violence and force was required before it could be said that the pickets misconducted themselves.

Replying to that contention, we said in National Labor Relations Board v. Indiana Desk Co., 149 F.2d on page 995, what may well be repeated here:

" * * * The fact that greater violence did not take place was due solely to the forbearance exhibited by respondent, and especially by the non-strikers. In other words, it was their reluctance to accept the challenge to engage in a pitched battle with forty or fifty men which in all probability saved the situation from much violence and bloodshed.

" * * * The result accomplished, intentionally and designedly, was no different than if the strikers had bolted the entrance doors to respondent's plant. * * *

"To hold that the striking employees in this case are entitled to be reinstated, some of them with back pay, is to put a premium upon their misconduct and to encourage like conduct on the part of others. How such action can effectuate the policies of the Act is beyond our comprehension. In N. L. R. B. v. Fansteel Corporation, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, the court, after disposing of the situation as to the 'sitdown' strikers, considered that concerning 17 strikers who operated outside the plant as aiders and abettors. Concerning them, the court on page 260 of 306 U.S., on page 498 of 59 S.Ct., 83 L.Ed. 627, stated:

" 'If it be assumed that by virtue of § 2(3) [29 U.S.C.A. § 152 (3)] they still had the status of "employees", that provision did not automatically provide reinstatement. Whether the Board could order it must turn on the application of the provision enpowering the Board to require "such affirmative action, including reinstatement of employees" as will "effectuate the policies" of the Act.'

"After concluding that the aiders and abettors were in no different situation than the 'sit-down' strikers themselves, the court stated: 'We find no ground for concluding that there is any policy of the Act which justifies the Board in ordering reinstatement in such circumstances.' "

In National Labor Relations Board v. Perfect Circle Co., 4 Cir., 162 F.2d 566, the Board ordered the reinstatement of four employees who, according to the company's contention, were discharged for having illegally barred the plant manager from the plant during a strike. This court said on page 568, of 162 F.2d:

"There was no actual violence. Whether there was threat of violence is a point

upon which the parties differ. The plant manager probably believed there would be violence and he therefore desisted in his attempt to enter the plant. He had, of course, the clear legal right to enter the plant. Any forcible obstruction to his exercise of his right was unlawful. If the employees unlawfully resisted Bancroft's right to enter the plant, the company was within its right in discharging the obstructing employees. If lawfully discharged, the Board erred in ordering their re-employment. * * *"

"The discharged employees in this case prevented the entry upon the employer's property. The effect of such action does not turn on whether the employees intended to yield if the employer persisted. The legal effect of such action is not lessened even though employees intended to use only oral argument against the manager's entry. *This is a case where the striking employees prevented the company's manager from entering the property.* Such prevention may be accomplished by physical force or violence; 'by beating the manager up,' or it may be accomplished by the employees so conducting themselves that the manager is unwilling to take the risk of being 'beat up.'

"The evidence in this case conclusively establishes that the four men did actually prevent the company's manager from entering the property. To this action we must give the same legal effect as if they had used physical violence to prevent the entry."

In the case at bar, it is undisputed that for more than a month non-striking employees who wished to go to work were unable to do so because of the picketing technique employed. In instances where non-strikers attempted to enter, actual physical violence and force were used to repulse them. In addition, delivery of property to and shipment of property from petitioner's plant, either by railroad or truck, was impeded.

The petition to vacate the order of the Board directing the reinstatement and back pay to the named employees is granted. The order that the 45 named employees be offered reinstatement with back pay is therefore vacated.

The order of the Board that The W. T. Rawleigh Company cease and desist from certain unfair labor practices is modified, by deleting therefrom the specific reference to the Union, and, as modified, is ordered enforced.