VICTOR PRODUCTS CORP. v. NATIONAL LABOR RELATIONS BOARD.

No. 11510.

United States Court of Appeals District of Columbia Circuit.

Argued April 7, 1953.

Decided July 16, 1953.

John R. Fitzpatrick, Washington, D. C., with whom Edward J. Lynch, Washington, D. C., was on the brief, for petitioner.

Frederick U. Reel, Atty., N. L. R. B., Washington, D. C., of the Bar of the Supreme Court of Wisconsin, *pro hac vice*, by special leave of Court, with whom A. Norman Somers, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., was on the brief, for respondent. Bernard Dunau, Atty., N. L. R. B., Washington, D. C., also entered an appearance for respondent.

Before EDGERTON, WILBUR K. MILLER and PRETTYMAN, Circuit Judges.

PRETTYMAN, Circuit Judge.

We have before us for review an order of the National Labor Relations Board. The Board held that petitioner Victor Products Corporation had violated Section 8(a) (1) and (3) of the Labor Management Relations Act [1] by discharging eighteen of its employees. Reinstatement and back pay were ordered, as well as termination of labor practices found to be coercive and discriminatory.[2]

---

1. 61 Stat. 140 (1947), as amended, 29 U. S.C.A. § 158(a) (1) and (3).

2. 99 N.L.R.B. No. 83 (June 5, 1952).

Employees at Victor's Hagerstown, Maryland, plant struck on April 10, 1950. Picket lines were established. At the main entrance, the scene of the disputed activities, approximately twenty-five strikers walked in an elliptical path a few feet from the door. Due to the close formation of the strikers on the picket line, entrance to the plant through the line was not possible without physical contact with the pickets. Access to the plant around the picket line was possible. The composition of the picket line varied, some pickets dropping out as others joined. Signs were carried by some, while a few carried sticks as canes. Surveillance was maintained by local police officers.

On the first morning of the strike a Company official named Steeley approached the picket line in order to enter the plant. A union leader ordered the pickets to "close up the line". Obediently the pickets massed themselves against the door. Steeley was effectively excluded from the plant, and he withdrew from the ensuing fracas. This episode is referred to as "the Steeley incident" throughout the present controversy. Other Company officials and many non-striking employees, desirous of entering the plant on the same morning, were discouraged from doing so upon being told that "no one is going to be allowed to enter the plant." [3] The plant door was not blockaded in these instances, although there was testimony that the picket line moved closer to the door when the personnel manager, Hartsock, approached.[4] The following day thirty-one strikers were discharged.

■ The law which protects proper union activity, and therefore protects peaceful picketing, does not protect striking employees who forcibly debar other employees from entering the place of employment.[5] On account of the discharges the union filed charges of unfair labor practices against Victor. The Board upheld the discharge of thirteen employees. That matter is not before us. The Board held the discharge of the other eighteen to have been in violation of the statute. It based that conclusion upon a finding of fact that "these employees were discharged solely because of their alleged participation in the so-called 'Steeley' incident"; and findings that these eighteen were not in fact participants in that incident. The Board did not consider whether any of these eighteen employees had participated in other unprotected activities, i. e., the debarment from the plant of employees other than Steeley.

The critical dispute concerns the just-quoted finding of the Board, that the employees were discharged solely because of participation in the Steeley incident. Victor says that finding is not supported by the record, that the discharges were for participation not only in the Steeley incident but also in the forcible debarment from the plant of employees other than Steeley at various times during the day.

■ We are required by the decision and opinion of the Supreme Court in Universal Camera Corp. v. National Labor Relations Board [6] to judge the validity of a finding of fact of an administrative agency by determining whether it is supported by substantial evidence upon the record as a whole. The Court there said:

"The Board's findings are entitled to respect; but they must nonetheless be set aside when the record be-

---

3. Only three employees entered the plant that morning. Two went around the picket line, and the other was allowed to go through the line at the behest of a police officer.

4. Neither the trial examiner nor the Board resolved the conflict of evidence on this point.

5. National Labor Relations Board v. Perfect Circle Co., 7 Cir., 1947, 162 F.2d 566; W. T. Rawleigh Co. v. National Labor Relations Board, 7 Cir., 1951, 190 F. 2d 832. See also National Labor Relations Board v. Fansteel Corp., 1939, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627.

6. 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456.

fore a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence **or** both." [7]

The entire record upon the point here in dispute consists of the discharge slips given the employees, the testimony of four witnesses, and to a minor extent the corroborating testimony of five employees. The four principal witnesses were by name Steeley, Paxson, Bowers and Hartsock. It is agreed that on the second day of the strike Steeley and Paxson, who, as assistant to the chairman of the board and plant manager, respectively, were in the top echelon of Company officialdom, interviewed employees as to occurrences of the previous day, and that they made up a list of employees to be discharged. Discharge slips were prepared according to the list. The slips were served upon the employees by Hartsock. Steeley, Paxson and Bowers testified that the discharges were for participation in any debarring incident. Hartsock testified that they were on account of the "Steeley incident" alone.

A closer view of the evidence shows that the discharge slips notified the affected employees that the action was taken "For forcibly blocking entrance to the plant 4/10/50." Such language, as a matter of ordinary description, is comprehensive of all blocking activities on the named date, including incidents in addition to the Steeley incident. Its author might have had reference, *inter alia*, to any or all of the several occasions when non-striking employees approached the line of twenty-five pickets, some of whom carried sticks, and were told by the leader that they could not enter the plant; and thus access to the plant through the picket line was apparently not possible without tilting with the pickets.[8]

Steeley, the assistant to the chairman of the Company's board, was the chief agent of the Company in designating the employees to be discharged. He testified that on April 10th and 11th he received reports from various people as to who was on the picket line when various employees were debarred. He testified that he had directed the discharges because (1) the dischargees were identified as being on the picket line when non-striking employees were told that they could not enter the plant or (2) the dischargees had "jammed-up against the doorway to prevent employees from getting in." He said, for example, "We picked out the people to be discharged on the basis of reports that were received, indicating that these people that were discharged had participated in blocking the entrance to some employees who wanted to gain entrance to the plant." And he said, "Mr. Ingram and I went up to go into the plant and were told that nobody was going in, and it was on that basis, *and other similar incidents*, that these men were discharged, not for being on the picket-line." (Italics ours.) And again he said: "The Company discharged certain employees because, at certain times during the day, when certain of our employees tried to gain entrance to the plant, they were told that no one could go in. Those employees discharged were identified as participating in blocking the entrance as to some of our employees."

Paxson, who was the plant manager, testified that he and Steeley had interviewed scores of employees who had either been blocked or seen others blocked from entrance into the plant. Paxson himself had interviewed from thirty-five to fifty persons. A list of those who had engaged in such activity was compiled and used as the basis for the discharges. Paxson testified that the lists were prepared mainly by Steeley and himself with possible "contributions" by Bowers. He testified: "Well, I went to them, or they

---

7. Id., 340 U.S. at page 490, 71 S.Ct. 456.

8. In thus describing the possible intendment of the discharge slips, we intimate

no opinion at this stage of the case as to whether such concerted activity by the pickets is unprotected within the meaning of the Act.

came to me, and we asked them what they had observed on the previous day; had they observed any of our employees being blocked in their endeavor to enter the plant? If they had, or if they, themselves, had been blocked, we then asked them if they could identify any of the pickets who took part in blocking them." And again he said, "I made no effort to segregate the information by individuals, by incidents or individuals." Five employees corroborated the fact that they had been called for such interviews. Bowers, the Company's vice president, testified that the list of dischargees included those involved in other blockings as well as those involved in the Steeley incident. He said that he aided in the preparation of the discharge lists. He did not recall having any conversation with Hartsock as to the discharges.

Hartsock, the Company's personnel manager, testified that the sole reason for the discharges was the mass-blocking of the entrance at the time of the Steeley incident. He testified that "top management" (i. e., Steeley, Paxson and Bowers) handled the discharges; that he did not participate in deciding which employees were to be discharged and did not know who made up the list. He said that he was informed of the reason for the discharges by some one of those three officials and that as personnel manager he was in a position to know, and did know, why the men were discharged. He did not remember which official gave him the information.

The trial examiner, after briefly reviewing the conflicting evidence upon this issue, adopted Hartsock's testimony. His finding was: "Hartsock was a trustworthy witness in respect to his aforestated testimony and I accordingly find that the Respondent discharged the employees in question *solely* because they allegedly debarred Steeley on April 10, 1950." In the related footnote the examiner said: "I must therefore reject the Respondent's contention, as unsup-

ported by substantial credible evidence, that it discharged the employees involved for various other incidents as well." In the immediately preceding footnote the examiner gave two reasons for his conclusion on the point. He there stated: "Neither Paxson nor Steeley credibly denied having the aforementioned conversation with Hartsock. In evaluating the credibility of these respective witnesses * * * I have also considered * * * the circumstance that Hartsock's testimony was given comparatively early in the proceeding at a time when, in my opinion, his testimony in this respect was much more entitled to belief than that of Paxson and Steeley who testified later." The Board, without discussion, adopted the trial examiner's finding that the Steeley incident was the sole reason for discharge.

The only testimonial support for the finding that the Steeley incident was the sole reason for discharge came from Hartsock. While he testified that he was informed to that effect, he said that he had nothing to do with the determination of who was to be discharged or for what cause. His testimony to the reasons for the discharges was hearsay. No substantial ground for discrediting the testimony of Steeley, Paxson and Bowers was stated by the Board or the examiner. Their testimony had the convincing force of direct knowledge as to the reason or reasons for the discharges. The discharge slips which they authorized were entirely consistent with their testimony.

The reason the examiner rejected the testimony of Steeley, Paxson and Bowers was not that their demeanor while testifying detracted from their credibility.[9] Neither Paxson nor Steeley was questioned concerning the conversation with Hartsock, and so their failure to deny it, relied on by the examiner, was of no significance. Nor is the examiner's finding a product of administrative expertise which adds to the usual caution against judicial interference.

9. See National Labor Relations Board v. Dinion Coil Co., 2 Cir., 1952, 201 F.2d 484, for the weight to be given the examiner's findings when based on "demeanor evidence".

■ The factor used by the examiner, according to his statement, and the only one described by him, in "evaluating the credibility of these respective witnesses" was obviously improper. The mere fact that one witness testifies earlier in a hearing than does another is immaterial to credibility, unless it is claimed that the later witnesses were forewarned by the earlier testimony and conspired to commit perjury in refutation of it. No such situation is conceivable on this record, nor is it claimed. A finder of facts cannot believe that which he first hears and then close his mind to all that comes thereafter. It is elementary that the order in which witnesses testify does not bear upon their credibility.

■ In sum, there appears on the one hand the testimony of three responsible officials of the Company, who testified directly that they determined who would be discharged, that they made up the discharge lists, and that the discharges were for participation in various incidents; their testimony is supported by the language of the discharge slips, and it is clear from the testimony of at least five employees that there were interviews. On the other hand there is the testimony of one officer who had no part in the decisions and who learned what he knew from a person whom he could not identify. This, we think, presents a precise example of what the Congress and the Supreme Court meant by substantial evidence upon the record as a whole, in contradistinction to the unmodified "substantial evidence" rule which was so generally applied prior to the Administrative Procedure Act and the Universal Camera case, supra. The solid sense of the entire record [10] does not support the Board's finding.

The Board's finding might have been sustainable under the provisions of the Wagner Act,[11] which had been interpreted to mean that evidence of record, when viewed in isolation, would support the Board's finding. But the provisions of both the Administrative Procedure Act [12] and the Labor Management Relations Act [13] were meant to foreclose such picking and choosing.

We conclude that the Board's finding upon this basic issue of fact is not supported by substantial evidence when the entire record is considered.

■ The Company also urges that the Board erred fatally in failing to submit any affirmative evidence to prove union compliance with Section 9(f), (g) and (h) of the Act. We do not find any such absolute statutory duty imposed upon the Board.[14]

The order of the Board is reversed and the case remanded for a determination whether the other incidents described in the testimony constituted conduct which is not protected by the law relating to picketing, and, if so, whether the eighteen strikers here involved participated in such conduct.

Reversed and remanded.

EDGERTON, Circuit Judge (dissenting).

I think the Board's finding is supported, upon the record as a whole, by very substantial evidence. In my opinion the discharge slips strongly corroborate Hartsock. The words "forcibly blocking entrance to the plant" seem to me to de-

10. National Labor Relations Board v. Pittsburgh S. S. Co., 1951, 340 U.S. 498, 502, 71 S.Ct. 453, 95 L.Ed. 479.

11. Section 10(e), 49 Stat. 453 (1935).

12. 60 Stat. 243 (1946), 5 U.S.C.A. § 1009 (e).

13. 61 Stat. 148 (1947), as amended, 29 U.S.C.A. § 161(f).

14. National Labor Relations Board v. Greensboro Coca Cola B. Co., 4 Cir., 1950, 180 F.2d 840, 844–846; National Labor Relations Board v. Red Rock Co., 5 Cir., 1951, 187 F.2d 76, 77, certiorari denied, 1951, 341 U.S. 950, 71 S.Ct. 1017, 95 L.Ed. 1373; National Labor Relations Board v. Wiltse, 6 Cir., 1951, 188 F.2d 917, 920–924, certiorari denied sub nom. Ann Arbor Press v. National Labor Relations Board, 1951, 342 U.S. 859, 72 S.Ct. 87, 96 L.Ed. 647; Law v. National Labor Relations Board, 10 Cir., 1951, 192 F.2d 236, 239.

scribe the Steeley incident and nothing else. Certainly the Board might reasonably understand these words in this way. If the words are so understood, the Board's finding has ample support. In deference to my brethren I concede that the words might reasonably be understood in a different way, but this does not mean that the Board's finding lacks support. The "requirement for canvassing 'the whole record' in order to ascertain substantiality does not * * * mean that * * * a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456.