UNION MANUFACTURING COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 12021.

United States Court of Appeals, District of Columbia Circuit.

Argued May 25, 1954.

Decided Jan. 14, 1955.

Writ of Certiorari Denied May 9, 1955. See 75 S.Ct. 660.

Danaher, Circuit Judge, dissented.

---

Mr. John R. Fitzpatrick, Washington, D. C., with whom Mr. Edward J. Lynch, Washington, D. C., was on the brief, for petitioner.

Mr. Frederick U. Reel, Attorney, National Labor Relations Board, Washington, D. C., of the Bar of the Supreme Court of Wisconsin, pro hac vice, by special leave of Court, with whom Mr. A. Norman Somers, Asst. General Counsel, National Labor Relations Board, Washington, D. C., was on the brief, for respondent.

Before PRETTYMAN, WASHINGTON and DANAHER, Circuit Judges.

PRETTYMAN, Circuit Judge.

This is a petition for review of an order of the National Labor Relations Board. The Board had found that the Company, our petitioner, had committed an unfair labor practice within the meaning of Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act as amended,[1] in refusing to bargain with a union certified by the Board after an election.

The facts were stipulated, and the question before us is a question of law, one of statutory construction. A strike occurred at the Company's plant. It is agreed that it was an economic strike. While it was in progress the American Federation of Hosiery Workers, A.F.L., requested the Company to recognize the Federation as the bargaining representative of the employees. An election was held. When certain strikers appeared to vote, the Company challenged their votes. There were enough challenges to affect the result of the election, and the Company refused to bargain with the union selected by counting the challenged votes. The Board considered the challenges and at first ordered a hearing but then, without a hearing, overruled them. This is the order under review.

The challenges were upon the ground that the strikers involved had been guilty of strike misconduct and so were not entitled to vote under a specific provision of the statute. Affidavits submitted to the Board were said to establish the facts of misconduct. These strikers had not been discharged by formal action of the Company, and they had not been replaced or denied reinstatement.

The statute contains this sentence:

"Employees on strike who are not entitled to reinstatement shall not be eligible to vote."[2]

The question before us is the meaning of the foregoing sentence.

The Company says that it is established that strikers who engage in misconduct are not eligible for the protection of the Act and are not entitled to an order of reinstatement (citing cases), that the purpose of the statute is industrial peace, and that the disputed sentence means precisely what it says.

---

1. 61 Stat. 140 (1947), as amended, 29 U.S. C.A. § 158(a) (1) and (5).

2. Section 9(c) (3) of the National Labor Relations Act as amended, 61 Stat. 144 (1947), 29 U.S.C.A. § 159(c) (3).

The Company says that discharge or replacement of these strikers was a matter for managerial discretion in the Company and that the employees were not "entitled" to either. It says that any employee who is not qualified for the protection of the Act—by reason of discharge, replacement, or because he is subject to denial of reinstatement—is "not entitled to reinstatement" and so, according to the Act, is not entitled to vote. It says that to hold that an employer must take an affirmative action of discharge or replacement, and thus must subject itself to charges and claims for damages, is to impose upon an employer a burden clearly not contemplated by this provision of the Act. It says, moreover, that, if actual discharge or replacement is the sole criterion of eligibility to vote, the employer has control in a major way over the election. It says that the purpose of the disputed sentence is to limit eligible voters to those employees who have not forfeited their rights to reinstatement. The gist of the Company's contention is that the disputed sentence creates a special class of strikers, consisting of those who by their acts of misconduct have forfeited their rights to protection under the statute and so are ineligible to vote. The Company relies upon the literal reading of the sentence.

The Board says that the basic criterion for eligibility to vote is whether the voter will be affected by the election; that if it be clear that an employee will not be affected—i.e., if he has been discharged or replaced—he cannot vote; otherwise he is eligible. It says that any economic striker can be denied reinstatement for any nondiscriminatory reason and that the phrase "not entitled to reinstatement" could not reasonably be held to refer to all economic strikers. It says that a striker who engages in misconduct does not automatically forfeit reinstatement, he merely supplies a ready reason for his employer's action. If the employer chose not to replace these strikers and they were ultimately reinstated after being denied a vote, they would thereafter be represented by an agent not of their choosing. It says that prior to the insertion of the disputed sentence in the statute both employees who had been replaced and their replacements could vote by well-established rules of the Board and that the sole purpose of the sentence was to eliminate this unseemly duplication. It says that the sentence means that strikers actually discharged or replaced, and so in a real and actual sense not entitled to reinstatement, cannot vote.

[1] In the light of these opposing contentions we think the disputed sentence is ambiguous. On the face of it both contentions have reasonable support. Since the sentence upon its face is ambiguous we turn to the legislative history to try to ascertain its meaning from its purpose.

That portion of Section 9(c) (3) with which we are concerned was not in the bill initially passed by the House of Representatives.[3] It first appeared in the version of the bill as reported to the Senate by its Committee.[4] Thereafter a unanimous consent agreement was reached in the Senate, providing that the House bill be amended by substituting the text of the Senate bill as amended.[5] The sentence then contained a clause "unless such strike involves an unfair labor practice on the part of the employer."[6] Following passage in the Senate the bill went to conference, where the "unless" clause was deleted and the form now before us adopted.[7]

3. H.R. 3020, 80th Cong., 1st Sess. § 9(c) (3) (1947), 1 Legislative History of the Labor Management Relations Act, 1947, p. 59 (G.P.O.1948) (hereafter cited as Leg.Hist.).

4. S. 1126, 80th Cong., 1st Sess. § 9(c) (3) (1947), 1 Leg.Hist. 119.

5. 93 Cong.Rec. 4999, 5117 (1947), 2 Leg. Hist. 1468, 1522.

6. H.R. 3020 (with amendments of Senate), 80th Cong., 1st Sess. § 9(c) (3) (1947), 1 Leg.Hist. 246.

7. H.R.Conf.Rep.No.510, 80th Cong., 1st Sess. 49–50 (1947), 1 Leg.Hist. 553–4.

From this legislative history it is apparent that the discussion in the Senate reflects the Congressional understanding of the legislative purpose. The Senate Report stated:

"When elections are conducted during a strike, situations frequently arise wherein the employer has continued to operate his business with replacement workers. If such strike is an economic one and not caused by unfair labor practices of the employer, strikers permanently replaced have no right to reinstatement (N. L. R. B. v. Mackay Radio, 304 U.S. 333 [58 S.Ct. 904, 82 L.Ed. 1381]). It appears clear that a striker having no right to replacement [*sic*] should not have a voice in the selection of a bargaining representative, and the committee bill so provides." [8]

In the Mackay Radio case a strike by all the workers was staged in a branch office of a communications company. In order to maintain service the company imported employees from its other offices to fill the strikers' places. After the strikers returned to work, five of the imported workers desired to remain, so the company notified five strikers that the roll of employees was complete and they would not be reinstated. The Supreme Court held that the replaced strikers had no right to reinstatement provided there was no discrimination exercised against employees because they had been active in the union. That case involved an affirmative act by the employer—replacement,—and its citation in the Senate Report is an indication that the Senate had that situation in mind. Senator Taft, Chairman of the Committee which reported the bill, discussed on the floor of the Senate the sentence now before us. He used as an example a case in California, where strikers had been out eighteen months and had gradually been replaced. Even though the replaced strikers were working on new jobs elsewhere, they cast votes in an election of a bargaining agent at their former place of employment. Thus the employer was left helpless to stop the strike, because he could deal only with the union representing men who were no longer in his employ. Senator Taft stated that this bill was designed to end this sort of situation by providing that former employees cannot vote in an election.[9]

One of the authors of the Senate Minority Report on this bill attacked the provision and asked for an interpretation. A member of the majority of the Committee replied and cited a situation where "the individuals who were on strike and whose jobs had been filled, and who were not entitled to reinstatement, swung the election and decided the bargaining agent. There was the ridiculous situation of a thousand persons voting for a bargaining agent for only 500 jobs. That does not make sense. All the amendment does is to say that only employees, who under present rules are on strike and entitled to reinstatement, can vote to select the bargaining agent." [10]

This same majority member, Senator Ball, later made a radio speech, printed in the Congressional Record, in which he interpreted the provision as follows:

"Section 9 of the National Labor Relations Act, which deals with election of bargaining representatives, is completely rewritten in the pending bill, with every change * * * designed to assure to employees, not employers, their full rights and freedoms.

"Briefly, those changes * * * (5) [provide] that when an election is held during a strike, only employees working or entitled to reinstatement may vote. The Board at present permits strikers who have

8. Sen.Rep.No.105, 80th Cong., 1st Sess. 25 (1947), 1 Leg.Hist. 431.

9. 93 Cong.Rec. 3838–9 (1947), 2 Leg.Hist. 1014.

10. 93 Cong.Rec. 4196 (1947), 2 Leg.Hist. 1102.

been replaced and have no legal right to reinstatement to vote, and in effect, block the free choice of the real employees." [11]

It thus appears that both majority and minority members of the Senate Committee sponsoring the bill interpreted the provision in the same way. [12] There is no helpful legislative history on the House side.

■ Upon the basis of the history of the sentence here in controversy, we think it clear that its purpose was to make ineligible strikers whose reinstatement rights had already been destroyed by the employer's action and who were for that compelling reason ineligible for reinstatement at the time of the election. Such being its legislative intent, and the sentence being otherwise ambiguous, we hold that to be its meaning.

■ We are in accord here with the authorities which require great weight to be given an administrator's interpretation of the statute he is directed and empowered to administer. [13]

Our dissenting judge would give controlling weight to the purpose and policy of the statute. He says, correctly, that this purpose and policy is the preservation of peace in industry-labor relations. We do not agree with his estimate of the restraining effect on striking employees of a threat of denial of voting rights. The employer has a right to discharge employees who misconduct themselves. We think a mere denial of a vote in a bargaining agent election would add little, if anything, to the deterring effects of the employer's right to discharge. If an employee is not deterred

from violence by the risk of discharge, it seems unlikely that he would be deterred because he might not be allowed to vote in the election.

We think the challenges here involved were not valid as a matter of law. It follows that the order of the Board must be sustained. An order of enforcement will be entered.

Affirmed.

DANAHER, Circuit Judge (dissenting).

Section 9(c) (3) of the National Labor Relations Act, as amended, [1] provides in part: "Employees on strike who are not entitled to reinstatement shall not be eligible to vote." The Board construed this language to mean that strikers who had engaged in unlawful strike misconduct, characterized as debarring activities, were nonetheless eligible to vote if, prior to the election, they had not been discharged or replaced. A number of such strikers, sufficient to affect the result of the election, were permitted to vote despite the employer's objections. The Board rejected the employer's contentions as a matter of law and, without a hearing, ordered the employer to bargain collectively with the union. The Board's conclusion rests solely on its interpretation of one paragraph of the statute and not on matters within its own special competence. [2] Thus, it is for the court "to determine what the governing principle is." F. C. C. v. RCA Communications, Inc., 1953, 346 U.S. 86, 91, 73 S.Ct. 998, 97 L.Ed. 1470. I would remand the case to the Board for a hearing on the merits of the employer's objections. [3]

11. 93 Cong.Rec. A2252–3 (1947), 2 Leg. Hist. 1525.

12. See 93 Cong.Rec. 6527 (1947), 2 Leg. Hist. 1696.

13. Unemployment Compensation Comm. v. Aragon, 1946, 329 U.S. 143, 67 S.Ct. 245, 91 L.Ed. 136, and cases there cited; Brooks v. National Labor Relations Board, 1954, 347 U.S. 916, 74 S.Ct. 517, 98 L.Ed. 1071; Id., 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. ——.

1. 61 Stat. 143 (1947), as amended, 29 U.S. C.A. § 159(c) (3).

2. Cf. Brooks v. National Labor Relations Board, 1954, 348 U.S. 96, 75 S.Ct. 176.

3. The Board concedes that the employer's affidavits establish a showing of strike misconduct on the part of each of the challenged voters sufficient to warrant a hearing on the merits, if it be assumed that the Board misconstrued the law.

From the employer's charges, which for present purposes must be accepted, the issue may be highlighted.

About March 4, 1952, certain employees began a strike which was not the result of an unfair labor practice. On March 12, 1952, a union requested and was refused recognition by the employer. Over the next several months, it may be gathered from the charges, tempers rose, strife developed, and the employees whose voting rights are here challenged were charged with debarment, violence, mass picketing, and generally lawless conduct on the picket line. While the strike was still in progress, on June 25, 1952 a representation election was held among all the company's employees. The Board determined that a majority of valid ballots had been cast for the union although the vote might have been otherwise if the Board had recognized the claimed ineligibility of the "misconduct" strikers.

Various contentions of the employer and of the Board have been summarized in the majority opinion, but the employer really claims that under Section 9(c)(3), no affirmative action by the employer is necessary to disqualify a striker whose own misconduct has worked a forfeiture of his status as a voter. Cited are numerous cases which hold "that strikers who have engaged in unprotected conduct and have been discharged or denied reinstatement by the employer are not entitled to an order of reinstatement."

The Board, on the other hand, argues that the employer is required to exercise whatever discharge rights he may have under the circumstances, and, in reliance upon Section 2(3) of the Act[4] the Board contends that a striker who engaged in unlawful conduct remains an employee until the employer " 'affirmatively exercises his option to terminate the relationship, either by discharging the strikers or refusing reinstatement.' "[5] The Board grants that if the "misconduct" striker had been discharged or replaced *before* the election, he would not have been affected by the election and, hence, would not have been entitled to vote.

Both parties fall short of the real point at issue, in my appraisal. Both completely subordinate the public interest in the peaceful and orderly settlement of organizational questions. Both approach the problem as though nothing were involved but the private relationship between the company and its employees. We should look to the objectives of the Act for our answer.

The Act's purpose and policy are set forth in Section 1[6] as follows: "to prescribe the legitimate rights of both employees and employers in their relations affecting commerce, to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other, to protect the rights of individual employees in their relations with labor organizations * * * to define and proscribe practices on the part of labor and management which * * * are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce." Accordingly, Section 7 declares the rights of employees as Section 8 prohibits interference with those rights by employers or labor unions alike. The right to organize or refrain from organizing is implemented by Section 9 of the Act. Therein is provided the election machinery for determining questions of union representation. That means, at least, a free election, a voluntary choice, by employees lawfully eligible to vote.

Granted, "the Board enjoys wide discretion in determining the procedure

---

4. 61 Stat. 137 (1947), 29 U.S.C.A. § 152 (3).

5. The Board seems to confuse a Section 2(3) qualification of "employee" with qualifications of a *voter* if we have in mind the prescription of the Act as a whole.

6. 61 Stat. 136 (1947), 29 U.S.C.A. § 141 (b).

necessary to insure the fair and free choice of bargaining representatives by employees," Southern S. S. Co. v. National Labor Relations Board, 1942, 316 U.S. 31, 37, 62 S.Ct. 886, 86 L.Ed. 1246. But if it "is wholly reasonable to remove any possibility of intimidation by conducting the election in the absence of the employer's representatives," Id. 316 U.S. at page 37, 62 S.Ct. 889, what are we to say as to actual intimidation, if proved by groups of "misconduct" strikers bent upon coercion? Can one doubt, as here charged, from the timing of the strike and the union's demand for recognition that the purpose of the contemporaneous and continued violence and concerted strike misconduct was to coerce the employer and the non-striking employees into acceptance of the union as bargaining agent? Can it reasonably be argued that a bargaining representative has been freely chosen if misconduct strikers by violence, as here charged, can be permitted to cow their co-workers and at the same time be permitted by their own vote to determine the results of the election? If we are to say that unlawful conduct has no effect on the status of the strikers to select the bargaining agent for all, we put a premium on violent coercive action and reward the industrial strife the Act was designed to prevent. Cf. N. L. R. B. v. Indiana Desk Co., 7 Cir., 1945, 149 F.2d 987, 995.

The Board says, in effect, that the employer must act affirmatively in advance of the election and discharge or replace the misconduct strikers. Yet if the employer were so to act and make even an innocent mistake in imputing unlawful conduct to the wrong striking employee, the Board would impose upon him the unfair labor practice sanctions of Sections 8(a) (1) and (3) of the Act. Industrial Cotton Mills v. N. L. R. B., 4 Cir., 1953, 208 F.2d 87, certiorari denied, 1954, 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086. Moreover, in such situations as we see presented here, what would we say if the Board should interpret termination notices as a pre-cipitous discharge of the striking employees and accordingly hold there had been an attempt to interfere with the strike—another unfair labor practice? Cf. Kansas Milling Co. v. N. L. R. B., 1949, 86 N.L.R.B. 925, enforcement denied, 10 Cir., 1950, 185 F.2d 413; N. L. R. B. v. United States Cold Storage Corp., 1951, 96 N.L.R.B. 1108, enforced, 5 Cir., 1953, 203 F.2d 924, certiorari denied, 1954, 346 U.S. 818, 74 S.Ct. 30, 98 L.Ed. 344. The Board upon a showing the force of which it here concedes, should not be permitted to shift to the employer, at the latter's real and substantial risk, its own responsibility to foster the orderly disposition of labor disputes.

On principle, and in view of the decisions, the proper course to be evolved seems clear. In the leading case of National Labor Relations Board v. Fansteel Corp., 1939, 306 U.S. 240, 257–258, 59 S.Ct. 490, 497, 83 L.Ed. 627, the Supreme Court said:

"There is not a line in the statute to warrant the conclusion that it is any part of the policies of the Act to encourage employees to resort to force and violence in defiance of the law of the land. On the contrary, the purpose of the Act is to promote peaceful settlements of disputes by providing legal remedies for the invasion of the employees' rights."

In Victor Products Corp. v. N. L. R. B., 1953, 93 U.S.App.D.C. 56, 58, 208 F.2d 834, 836, this court reemphasized the principle of the Fansteel case, saying: "The law which protects proper union activity, and therefore protects peaceful picketing, does not protect striking employees who forcibly debar other employees from entering the place of employment." The doctrine seems to me unchallengeable in its emphasis on the peaceful and lawful settlements of labor disputes envisaged by Section 1 of the Act.

The recent decision of the Supreme Court in Brooks v. National Labor Relations Board, 1948, 348 U.S. 96, 75 S.Ct.

176, 181, speaking through Mr. Justice Frankfurter, reinforces the principles which should control. There, the Supreme Court sustained the Board's finding that the employer had committed an unfair labor practice, where one week after a Board election in which a bargaining representative was chosen, the employer attempted to support a majority of the employees who wrote a letter recanting the election decision. The Court criticized the employer for resorting to "self help" and suggested that his proper course was to take his problem to the Board. It is the Board's function—not the employer's—"to vindicate the rights of * * * employees to select their bargaining representative." Otherwise there is negation of the principle that "The underlying purpose of this statute is industrial peace." An attempt by the employer to arbitrate an organizational dispute "is not conducive to that end, it is inimical to it." [7] So here, under the Act, it is the function of the Board and, if need be, the courts, not of private employers, to secure the Act's public interest objectives. The Board's contention that the employer should have taken "affirmative" action is not only inconsistent with its position in the Brooks case, it is equivalent to shirking its own responsibility.

It is, of course, correct to say that one of the announced purposes of Section 9(c) (3) was to deal with the Board's previous practice of permitting both economic strikers and their permanent replacements to vote in representation elections despite the fact that the replacement had effected a constructive discharge of the striking employee. The language used by Congress does, indeed, meet that situation—but it is only one of the areas of impact. Also covered is the situation presented to us, particularly where in an entirely consistent fashion, Section 9(c) (3), without ambiguity, furthers achievement of the fundamental goal of resolving labor disputes in a peaceful and lawful manner. Legislators before now have announced only one objective when they had yet others in mind.[8] "Legislative history" is no substitute for what the Act says— or what it permits—nor is it inevitably to be relied upon, Ex parte Collett, 1949, 337 U.S. 55, 61, 69 S.Ct. 944, 93 L.Ed. 1207, especially if it produces unreasonable or contradictory results. It is to be doubted in the absence of the "legislative history" relied upon, that the majority would urge that the literal language of Section 9(c) (3) should be read to create confusion where the provision is clear, especially when read

---

7. An important passage from the Brooks case which gives setting to the current problem follows:

"Petitioner contends that whenever an employer is presented with evidence that his employees have deserted their certified union, he may forthwith refuse to bargain. In effect, he seeks to vindicate the rights of his employees to select their bargaining representative. If the employees are dissatisfied with their chosen union, they may submit their own grievance to the Board. If an employer has doubts about his duty to continue bargaining, it is his responsibility to petition the Board for relief, while continuing to bargain in good faith at least until the Board has given some indication that his claim has merit. Although the Board may, if the facts warrant revoke a certification or agree not to pursue a charge of an unfair labor practice, these are matters for the Board; they do not justify employer self-help or

judicial intervention. The underlying purpose of this statute is industrial peace. To allow employers to rely on employees' rights in refusing to bargain with the formally designated union is not conducive to that end, it is inimical to it. Congress has devised a formal mode for selection and rejection of bargaining agents and has fixed the spacing of elections, with a view of furthering industrial stability and with due regard to administrative prudence.

"We find wanting the arguments against these controlling considerations. * * *"

8. "Under such circumstances, our duty as a Court is to construe the word 'possession' as our judgment instructs us the lawmakers, within constitutional limits, would have done had they acted at the time of the legislation with the present situation in mind." Vermilya-Brown Co. v. Connell, 1948, 335 U.S. 377, 388, 69 S. Ct. 140, 146, 93 L.Ed. 76.

against the objectives of the Act as a whole. See Packard Motor Co. v. National Labor Relations Board, 1947, 330 U.S. 485, 492, 67 S.Ct. 789, 91 L.Ed. 1040; Gemsco Inc., v. Walling, 1945, 324 U.S. 244, 260, 65 S.Ct. 605, 89 L.Ed. 921. I would expect that legislative history and rules of statutory construction "may not be used to create but only to remove doubt." Russell Motor Car Co. v. United States, 1923, 261 U.S. 514, 519, 43 S.Ct. 428, 67 S.Ct. 778.

Accordingly we may assume that if Congress had intended only the limited result urged by the Board, it would have expressed itself more narrowly. Obviously the language of Section 9(c) (3) is much broader than would be necessary if its only purpose was to deny a ballot to replaced "economic" strikers. Hence, regardless of the fact that this specific problem may have given impetus to the enactment of Section 9(c) (3), I think we are required to give the section its natural application. Cf. Feitler v. United States, 3 Cir., 1929, 34 F.2d 30, 33, affirmed Danovitz v. U. S., 1930, 281 U.S. 389, 50 S.Ct. 344, 74 L.Ed. 923; National Labor Relations Board v. Highland Park Co., 1951, 341 U.S. 322, 325, 71 S.Ct. 758, 95 L.Ed. 969.

In this view, where do we find ourselves? The majority says that Section 9(c) (3), contrary to the employer's contentions, is limited by legislative history. The Board says, in effect, that Section 2(3) means "once an employee, always an employee." Even as it concedes that a misconduct striker may be discharged, it argues for a result where he *must* be discharged if he is not to be permitted to participate in a representation election. It is my view that no such result is compelled, and quite the contrary, that an employee may remain an "employee" within Section 2(3) and still not be eligible as a voter. In short, the fundamental goal of orderly and peaceful resolution of labor organizational problems not only permits but impels a construction of the Act which draws a distinction between an employee, lawfully entitled to participate in all authorized proceedings, and an employee who, without having been discharged, may forfeit, by his own misconduct, a right to vote. Such a construction based upon the Act as a whole, need not rely merely upon Section 9(c) (3), yet is entirely consistent with my understanding of its import.

Restated, the sum of the Act, its objectives, its provisions and the cases construing them, so far as here pertinent, can be deduced thus: (1) Industrial strife can be avoided or substantially minimized if all concerned recognize that none has the right to engage in acts or practices which jeopardize the public interest; (2) Employees have the right to join a labor organization or not, and to decide freely to have a bargaining representative or not; (3) It shall be an unfair labor practice for a labor organization or its agents to restrain or coerce employees in the exercise of their rights; (4) Employees who engage in a strike during a sixty-day "cooling-off" period are deprived of any right to participate in a representation proceeding; (5) Employees who engage in violent restraint or coercion may be discharged; (6) No Board order may issue to require the reinstatement of any employee who has been discharged for cause; (7) No such employee shall be entitled to reinstatement; (8) No employee who is not "entitled" to reinstatement shall be eligible to vote in a representation election; (9) A "valid" election when one is held may determine a bargaining representative for "all the employees" in an appropriate unit; (10) A "valid" election is one free from fraud, from restraint or from coercion of employees in the exercise of their rights.

Thus the legislative scheme may be shortly discerned. If it be followed, employees lawfully entitled to vote and who have a substantial interest in the choice of a bargaining representative will be protected as and if they choose to participate in its selection. Concerted activities carried on in a lawful and orderly manner will be encouraged. Unlawful activity, on the other hand,

will result in a forfeiture of voting privileges by those whose own misconduct has rendered them ineligible. This result seems eminently just and entirely compatible with principles of law and equity in other fields.

It is to be feared that a contrary conclusion will leave defenseless the public and non-participating employees and make a shambles of the peaceful objectives the Act seeks to attain. Is it too much to say that Congress expected no such result?