Stanley **GAINES**, Chairman, Target Area Coordinating Council, Inc., et al.

v.

Samuel **MARTINEZ**, Director, Region VI, Office of Economic Opportunity, and the Dallas County Community Action Committee, Inc.

Civ. A. 3–5792–B.

United States District Court, N. D. Texas, Dallas Division.

Dec. 19, 1972.

Samuel W. Hudson, III, Dallas, Tex., Laurence Bergman, Garland, Tex., and Cleophas R. Steele, Dallas, Tex., for plaintiffs.

Eldon B. Mahon, U. S. Atty., Kenneth J. Mighell, Asst. U. S. Atty., for defendants.

## MEMORANDUM OPINION AND JUDGMENT

HUGHES, District Judge.

The present suit, as filed, sought a declaratory judgment, injunctive relief and damages against the Office of Economic Opportunity (OEO), the Dallas County Community Action Committee, Inc. (DCCAC), and Samuel Martinez, individually and as Director of Region VI of the OEO. The complaint requested review of an OEO evaluation report concerning the DCCAC issued by Samuel Martinez on April 7, 1972. The Report made certain findings and recommendations about the DCCAC operations and programs, and the DCCAC adopted the Report on April 17, 1972, agreeing to implement the recommendations.

This Court heretofore considered several motions to dismiss this action and certain named parties. By prior order, the Court dismissed the Dallas County Community Action Committee and Samuel Martinez in his individual capacity because of the failure to state a claim against these parties upon which relief can be granted. By this order, the Court determined that its jurisdiction is limited to review as provided in the Administrative Procedure Act, 5 U.S.C. § 706 (1970).[1] The plaintiffs had failed to state claims which are cognizable under the Civil Rights Acts, 42 U.S.C. §§ 1983 & 2000d (1970).

The plaintiffs are Stanley Gaines, Chairman of the Target Area Coordinating Council, Inc., in his individual capacity and as a representative of TACC. In addition, the Court approved complaints in intervention filed by Jesse D. Oliver, O. D. Castile, Corria L. Smith, Joe Burton, Bob Rivens representing the Steering Committee for Neighborhood Credit Unions and Olga Rabon, Mrs. Francis Harris, and Lovie Lipscomb as representatives of the target area citizens of Dallas County. The plaintiffs and intervenors complained that they were suffering and will continue to suffer irreparable injury and damage because of the dissemination and implementation of the OEO Report. This Report allegedly called for certain changes in the Dallas County "War on Poverty" program as administered by DCCAC which adversely affect the plaintiffs and intervenors. The plaintiffs challenged the validity of the OEO Report because it contained material falsehoods and distortions of the facts; it made inferences which demonstrate clear error in judgment and abuses of discretion; and it contravened the principles and directives provided in the Economic Opportunity Act of 1964. 42 U.S.C. § 2781 et seq. (1970), hereinafter called the Act, and OEO Instructions and Guidelines.

The DCCAC is a community action agency authorized by the Economic Op-

---

1. § 706. Scope of review.

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity; .

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. In making the foregoing determinations the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

portunity Act of 1964. (42 U.S.C. § 2790). As set forth in Section 212(a) (42 U.S.C. § 2795) it has the power to enter into contracts with public and non-profit agencies and organizations to assist in fulfilling the purpose of Title II of the Act, Urban & Rural Community Action Programs. Section 221(a) of the Act, 42 U.S.C. § 2808, provides that the Office of Economic Opportunity, "may provide financial assistance to community action agencies for the planning, conduct, administration and evaluation of community action programs and components". Section 233 of the Act (42 U.S.C. § 2826) provides for evaluation of the program by OEO, the method by which such an evaluation shall be made and for a report of such evaluation.[2]

Prior to the OEO evaluation of the DCCAC which resulted in the Report under review by this Court, it was common knowledge in Dallas that there was serious controversy among the members of the DCCAC and disagreement as to the effectiveness of its programs. The testimony adduced at trial confirmed that there existed turmoil in the DCCAC Board activities. The evidence revealed that the Board of the DCCAC consisted of 33 members, eleven from the government sector, eleven community organization members, and eleven from the poverty or target areas. There were two factions among the members, one which believed in total self-determination by the poor without regard to administrative or technical skills of the participants; the other believed in total paternalism and in running the program with "plantation politics".

The president of the Board had for sometime been ineffective in conducting the affairs of the agency partly because of a lack of a quorum at meetings. There was testimony that several of the community and government sector members were in contact before board meetings and, if certain matters to come before the Board did not have enough support to insure a vote favorable to their view, they did not attend and therefore there was no quorum, thus no meeting. While the target area members likewise absented themselves on occasion they did not have enough votes to stop a meeting. With a board dominated by factionalism, DCCAC had become ineffectual and its program almost paralyzed.

The media of Dallas reported the inability of the Board to meet because of failure to obtain a quorum, and the constant controversy. This situation caused DCCAC to lose credibility in almost every sector of the community.

There was a difference among board members in the assessment of blame. Some felt the government sector was entirely responsible for the failure to funtion, others blamed the target area representatives, still others considered the problems to be the fault of individual power seekers. There was a consensus, however, that lack of effectiveness in the program was so serious as to require strong remedial action.

During the fall of 1971 and early months of 1972, the Regional Office of the OEO was acutely aware of the conflicts among board members and the resultant deterioration of the DCCAC activities and programs arising from the inability of the Board to meet and to transact business. The Regional Office received numerous complaints from individuals and groups about the operation of certain programs in the community. The problems of the Board reached crisis proportions when the county and city governments threatened to withdraw support of the program which would have resulted in the complete abandonment of the program.

In early 1972, the Regional Office decided to make an intensive evaluation of the DCCAC and its programs. The pur-

---

2. Sec. 233(a). The Director shall provide for the continuing evaluation of programs . . . including their effectiveness in achieving goals, their impact on related programs, and their structure and mech-

anisms for the delivery of services. . . . He shall . . . arrange for obtaining the opinions of participants about the strengths and weaknesses of the programs."

pose of the evaluation was to identify the problems in the Dallas anti-poverty program and to make recommendations for alleviating these problems and thereby preserving its operation. In March, the Regional Director, Samuel Martinez, directed the Chief of the Metropolitan Operations Division, Hamah King, to organize a monitoring team to conduct the review. King assembled 17 persons: eleven were from his office, two from the Financial Division, three from the State Office of Economic Opportunity and one Human Rights officer. The team undertook an exhaustive examination of the entire DCCAC program. This review included a careful examination of all records and documents of the organizations and interviews with members of the various boards, committees, and groups, as well as interviews with target area persons, employees of the DCCAC and delegate agencies, and local governmental officials. In approximately three weeks, the monitoring team made the interviews and investigations and from this information drafted the 68-page Report which is under review in this lawsuit.

After the monitoring team completed the Report and the Regional Director edited and approved its content, Samuel Martinez presented it to the DCCAC and held a press conference to announce its findings on April 7, 1972. The Director of OEO called for the adoption in ten days and implementation of the Report by DCCAC or face termination of funding by OEO. On April 17, 1972, in a closed meeting the DCCAC Board ratified the Report and agreed to implement its recommendations.

Before discussing the Report, it is necessary to understand the structure and objectives of the DCCAC and the various components which made up the community action agency program. Moreover, it is important to understand the relationship between the DCCAC and the delgate agencies and community organizations and groups.

The DCCAC is the community action agency which the OEO has funded pursuant to the mandate of the Act. It is governed by a tri-partite board of directors, as set out above, which is charged with the overall responsibility for administering the programs. It however, is free to delegate programatic responsibilities to organizations in the community. The DCCAC could contract with community corporations to operate specific programs in the neighborhoods.

The DCCAC had engaged in the delegation of programatic and advisory functions to several poverty area organizations. The agencies included the Neighborhood Service Centers, Community Houses, and Community Organizers. There were five Neighborhood Centers, each with an advisory board composed of three members from each neighborhood council. There were twenty-two Community Houses each governed by a neighborhood advisory council. Until March 1972 all Community Organizers were centrally housed. By administrative decision of the Executive Director, the organizers were assigned to the five Centers under the control of Center Managers.

The by-laws of the DCCAC provided for a coordinating council consisting of three representatives from each neighborhood advisory board and that the council "shall be the spokesman for the collective neighborhood center advisory boards and shall represent such boards before the Board of Directors in matters affecting the neighborhood centers." The Target Area Coordinating Council (TACC) chaired by Stanley Gaines served this function.

The DCCAC also operated the Youth Development Program and BREAD, which were formed for the purpose of supporting youth oriented economic development activities. The OEO also evaluated the DCCAC's Consumer Education and Credit Union programs. There were three neighborhood credit unions operated with funding and assistance from the Consumer Education program. Overall policy direction for the credit unions was in the hands of the Steering Committee for Neighborhood Credit Unions.

The structure and functioning of the entire anti-poverty program outlined in the Economic Opportunity Act and the guidelines of the OEO is permeated by the overriding objective of involving the participants and recipients of the program in the planning and implementation of the programs. To this end, the OEO endorsed the use of resident-controlled advisory bodies, neighborhood controlled delegate agencies and community corporations in carrying out the programs. The government has emphasized that the war on poverty is a federally assisted program which demands the cooperation and involvement of the poor people. OEO Instruction No. 6005-1 required "extensive and intensive participation by the poor and residents of poverty areas in the planning, conduct and evaluation of programs which affect their lives."

The evaluation of OEO included findings and conclusions in the following areas (1) DCCAC Board of Directors, (2) DCCAC Central Administration, (3) Neighborhood Service Centers and Community Organization, (4) Community Houses, (5) Consumer Education and Credit Union Program and (6) Youth Development program.

### The Report

The sixty-eight page Report of OEO is a scathing indictment of the anti-poverty program as being carried out in Dallas County. Blame was placed on all segments of the community for abdicating their responsibility and failing to give adequate support to the national effort to eliminate poverty.

According to the Report the Board of DCCAC had taken significant action on important matters without sufficient information. The Executive Committee exercised an undue degree of authority. There was no evidence that appointed committees had even met. The Board Chairman had acted without consulting either the Executive Committee or the Board of Directors.

With reference to the Central Administration the Report declares that much confusion existed concerning lines of authority, channels of supervision and reporting. Personnel policies, according to the Report, were ineffective, the work programs were inadequate, the training program had no goal or job-related training, and there was a lack of coordination of programs of the various neighborhood agencies.

In regard to the Neighborhood Centers, the Report is complimentary of the program and the staff which seemed eager to run the best possible program for the poor. There was, however, so the Report contends, poor coordination between centers and other programs, insufficient outreach in contacting people in the community and in determining community resources, and lack of planning in the manpower program in creating new jobs in institutions through adequate in-job placement percentage. The community organizers, who according to the Report, had an impressive knowledge of organization and who set up and conducted meetings in which the neighborhood boards were trained in their roles as delegate agencies, were handicapped by not being permitted to use Community Houses for their meetings.

Neighborhood Center Advisory Boards, the Report finds, had little concept of their roles or of program planning, and attendance at meetings was poor due to bickering, arguing, and power grabs by a few.

There were twenty community houses each with a council at the time of the evaluation. By an agreement of May 18, 1971, between DCCAC and TACC, DCCAC provided that TACC should oversee the Community House program.

It is not clear from either the Report or the testimony whether the Community House Component was a separate entity. According to the Report the component appeared in the priorities for DCCAC in March 1971, and OEO granted $159,023 for the program. From the testimony the Community House Component appears to be simply a term used to encom-

pass all the Community Houses. The record revealed that on January 31, 1972, TACC Executive Committee set up a Governing Board for the Community Houses, consisting of one member from each Advisory Council of the Community Houses.

The Report is particularly critical of TACC's connection with the Community Houses. By the agreement of May 18, 1971, DCCAC relinquished its authority to direct the Community House program. As a result there was a lack of supervisory management from DCCAC, and the Report placed blame on the DCCAC for the inability of the component to carry out the community action concept of organizing the people to deal with their own problems.

The Report reflects that the House managers were discouraged from cooperating with other employees, with community organizations, and their advisory councils. They were told not to leave their houses, resulting in insufficient outreach efforts. Records of attendance were inaccurate and falsified. Advisory councils had no real control over the houses.

The work program is criticized by the Report for its failure to emphasize priorities set up by OEO guidelines or relevant to community problems. It is contended by the Report that "a review of the Community House program and its actual activities in light of OEO's standards reflect little or no effort by the component to stimulate measurable improvement in the way that the community responds to the problems and needs of the poor."

The structure receiving the major portion of criticism in the Report is the Target Area Coordinating Council (TACC). The bylaws of DCCAC provided for TACC in Article IV under Neighborhood Organizations as follows:

"A coordinating council composed of three representatives from each neighborhood center advisory board and three members-at-large shall be the spokesmen for the collective neigh-borhood center advisory boards and shall represent such boards before the Board of Directors in matters affecting the neighborhood centers. Such coordinating council shall operate under its own bylaws, which shall be consistent with the bylaws of this corporation and the guidelines of the Office of Economic Opportunity."

In place of being an advisory group as contemplated by the bylaws of DCCAC, the Report contends that TACC "permeates throughout the activities and structure" of DCCAC and assumed control of the agency.

By an agreement of March 16, 1971, with DCCAC, TACC was given responsibility of screening applicants for positions, recommending policies, evaluating programs, assisting neighborhood organizations in setting goals and in drawing bylaws for such organizations. By Executive Committee action on July 1, 1971, it obtained complete influence over all hiring for community organizations.

By letter of May 18, 1971, DCCAC agreed to the establishment of TACC as the Coordinator of the Community House program. It was their responsibility to select the Coordinator of the program and for program planning, implementation and evaluation.

It was also contended that TACC controlled the Center Advisory Boards by always having members of TACC Board present at meetings and unduly influencing decisions. This was particularly true in selecting work priorities and in the program of decentralization.

The Bylaws of TACC provided that four members of the Board constituted a quorum and if at a meeting a quorum was not present the meeting could be adjourned until another day at which time those present could transact business. This provision was contrary to OEO guidelines which required 50% for a quorum. Officers were elected for three years and during the interim between Board meetings they were authorized to transact all business. It was the contention of the OEO Report that these

provisions placed too much power in the hands of too few people.

It was pointed out in the Report that TACC's bylaws extended its purposes beyond that contemplated by the By-laws of DCCAC. They made TACC a monitor and evaluator of the programs and activities of DCCAC, established it as a lobbyist for neighborhood organizations and as arbitrator of such organizations.

In commenting on the bylaws of the Community House Governing Boards and the Neighborhood Boards, the Report points out that all existed under the auspices of TACC, none providing for any relationship to DCCAC.

The Report charges that the purpose of TACC was to control DCCAC programs. This was accomplished in part by the agreements of March 16, 1971, and May 18, 1971, through its own by-laws and those of the neighborhood agencies. TACC had strong leadership in its president, Stanley Gaines, and his willing co-worker Allene Hardy. Both were willing to take over responsibility not only in the neighborhood organizations but also in DCCAC and its Board. This could not have been done with a strong DCCAC Board but DCCAC willingly relinquished its responsibility and leadership.

In evaluating the Consumer Education and Credit Union Program the Report termed the Credit Unions "vigorous and active with a significant level of volunteer involvement and participation." It was, however, critical of the bylaws of the Steering Committee which managed the Program in that less than fifty percent of its membership could conduct business. In addition the Report found confusion in the organizational structure and a lack of coordination between these two programs and other activities of DCCAC. Here again, Stanley Gaines had taken the leadership as a member of the Steering Committee. It was recommended by the Report that these programs be placed directly under the DCCAC Central Administration.

The Youth Development Program was extremely complex being operated through three entities; the Youth Development staff whose members were under the DCCAC administration; the Dallas County Youth Council, which recommended youth programs to the DCCAC Board; and BREAD, a profit making corporation, organized to support youth oriented economic development projects.

The Report found little that was favorable in the administration of the program. The staff was ineffective and the Neighborhood Youth Councils had little understanding of the objectives of the program. Actual youth participation was minimal. There was no evidence of overall planning by the staff or the councils. The economic development projects funded through BREAD, the training program of the program, were minimal and ineffective.

### Conclusions of the Report

The Report makes it clear that the chief blame for ineffectiveness of the programs rests on the DCCAC Board and the power groups that have permeated the entire structure of the agency. The Board, the Report concludes, "has acted irresponsibly or not at all. . . . (It) has not developed mechanism to inform itself of the contents or progress of the activities which it manages (or those) who have dominated and directed those activities."

The situation, the Report further concludes, calls for drastic and determined intervention on the part of OEO and unless corrective action is taken immediately federal assistance will be terminated, the Report warns.

### Courses of Action

The report listed the following requirements in order for funding to be continued:

"I. *Board Structure and Functions*

 A. The board of DCCAC must restructure itself to operate

through an effective committee system within sixty (60) days.

. . .

B. A system of evaluation and systematic submission of program information to the board must be developed and implemented within sixty (60) days.

C. Effective procedures for audience participation at board meetings must be developed and implemented within thirty (30) days. . . .

D. Except for good cause, the board must adhere to its bylaws requirements on meeting times and places. OEO regulations regarding notice of meetings must be observed.

E. The board must establish a continuing system for orientation of board members and the entire board must participate in a board training session to be conducted by OEO within the next sixty (60) days.

F. The organization's bylaws must be changed to limit the powers of the Executive Committee to actions of an emergency nature between board meetings. Any policy decisions of the executive committee the effect of which extend beyond the next board meeting must be ratified by the full board.

G. Revised personnel policies which eliminate provisions in the current policy which handicap effective personnel administration must be adopted. . . .

H. . . .

I. The board with the staff must develop and submit an Affirmative Action Plan which complies with OEO regulations and assures fair and equitable practices to all ethnic groups in employment, program participation and facility locations.

II. *Programmatic Policy*

A. All delegate agency arrangements in OEO funded programs with the exception of Family Planning must be suspended within the next ten (10) days. This means that all OEO funded activities with the exception of Family Planning will be operated directly by the agency's central administration. To accomplish this no positions need be eliminated at this time.

B. Any authority other than strictly advisory which has been given to any boards, councils and/or other advisory groups involved in OEO funded programs other than Family Planning, below the level of the DCCAC board must be withdrawn within the next ten (10) days.

C. The community houses must be merged with the neighborhood service centers under the direction of the director of neighborhood service centers within ten (10) days.

D. A plan and schedule for decentralization, based on the staff developed plan, must be finalized within thirty (30) days. Such a process should and must provide for an orderly and effective transition of responsibility and authority over appropriate programs to neighborhood based organizations.

E. DCCAC central administration must develop the monitoring, evaluation, training and technical assistance capacity to effectively operate programs and to implement the decentralization process. . . .

*Central Administration*

A. The administration organization of DCCAC must be revised to enable effective implementa-

tion of the decentralization process and all other programs administered by the agency.

. . .

B. The OEO special condition on conflict of interest must be implemented within ten (10) days.

. . .

C. All direct financial assistance to organizations, boards, or committees below the level of DCCAC must be suspended immediately.

D. Before any new staff is employed at the project director level or above, OEO must concur in the qualification requirements and the recruitment methods to be utilized.

*Program Operations*

A. Specific reforms and corrective actions outlined in the monitoring report must be implemented.

B. No further program commitment of youth funds may be made until the entire youth program has been reorganized and approved by OEO. Where definite fund commitments have been incurred, these may be honored. If doubt exists, OEO clearance must be obtained.

C. No new operations of BREAD, Inc. over which the DCCAC board holds approval authority may be begun unless specifically approved by OEO. . . .

D. No new programs or significant changes in work program or organization may be implemented, except for those immediate corrective measures required by this report unless approved in advance by OEO."

As heretofore stated the OEO Report was issued on April 7, 1972, and adopted by the DCCAC on April 17, 1972.

The original complaint in this case was filed on April 19, 1972. Thereafter intervenors, members of the Steering Committee for Neighborhood Credit Unions filed a motion for temporary restraining order to restrain Defendants from implementing the Report as it pertains to the credit union program.

At a conference of attorneys representing all parties called to discuss the issuance of the Restraining Order it was agreed that the portion of the OEO Report providing that the Credit Unions should be placed directly under DCCAC Central Administration was contrary to the law which requires a credit union to be self governing. 12 U.S.C. Sec. 1761. An order was thereupon entered providing that the Credit Unions should continue as separate and distinct entities and its employees would not be answerable to the DCCAC Board of Directors.

At the trial the plaintiffs offered no testimony to refute the findings of the Report on the DCCAC Board of Directors, its Central Administration or Youth Development program. Testimony was confined to the Credit Unions, the programs of the Community Houses, the Neighborhood Centers and TACC.

With respect to these entities, witnesses were offered by Plaintiffs on the following matters: (1) the activities of the Community House Component as they relate to poverty related programs, (2) the organization and functioning of Boards of the Community House Component and the Neighborhood Centers, (3) the work program of Community Houses, (4) the relation of Community Houses and Neighborhood Centers to each other and to the community, (5) the bylaws of TACC and its method of functioning, (6) the relation of TACC to DCCAC, (7) TACC's influence in the neighborhood agencies, (8) the participation of Stanley Gaines and Mrs. Allene Hardy, as members of TACC, in the decision making of the neighborhood agencies and in their management, (9) conflicts of interest among TACC members and DCCAC, (10) the relationship of TACC to the DCCAC Board and central administration, (11) the Credit Union program and its relation to other credit

unions, (12) the Consumer Education program.

■■ Courts are confronted with a dilemma when asked to review actions of agency heads which obviously were based on evidence taken, sifted and analyzed by subordinates. Morgan v. United States, 298 U.S. 468, 481, 56 S.Ct. 906, 80 L.Ed. 1288 (1936). Yet the Court can take cognizance that the volume of business of the federal agencies is of such proportion that agency heads must rely upon subordinates to supply them with the information upon which their decisions are made. The Regional Director in this case delegated the fact gathering job to his subordinates. From this information, the Regional Director prepared the Report and decided on the course of action which the DCCAC must follow. In considering the action of the Regional Director, there is a judicial presumption of regularity of administrative action. Udall v. Washington, Virginia & Maryland Coach Co., 130 U.S.App.D.C. 171, 398 F.2d 765, 769 (1968).

The plaintiffs in this case have raised many objections to the facts related in the Report. In several instances they have challenged the inferences which the Director made from the facts. This Court has found that the evidence in a few instances does tend to contradict the findings of the Report. Indeed, some of the facts were found to be incorrect. The bulk of the testimony and evidence adduced at trial, however, merely amplified the Report's findings. Considering the total Report, the instances of inaccurate facts and findings were not such as to materially alter the ultimate findings and order of the Regional Director.

■ The plaintiffs have vigorously urged that the inferences drawn by the Regional Director were erroneous and arbitrary. In some instances this Court would not have come to the same conclusions as the OEO nor would have directed certain of the courses of action required by the Report, but this Court has little choice of remedies. It may not substitute its judgment for that of the Regional Director on the issue whether the inference drawn is the correct one or whether a different inference would be better supported. "The court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed. 2d 136 (1971). After consideration of the pleadings, the Report, the evidence and the argument of counsel, it is the finding of the Court that the Report and the action required are not arbitrary, capricious, and an abuse of discretion, contrary to law, or unwarranted by the facts.

*The Applicable Law*

The plaintiffs in this action have sought relief under the Administrative Procedure Act, 5 U.S.C. Sec. 500 et seq. (1970). This Act provides that the actions of governmental agencies, which includes the Office of Economic Opportunity, are subject to judicial review except when review is prohibited by law or when "agency action is committed to agency discretion by law." 5 U.S.C. Sec. 701. Moreover, section 702 specifically provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

■ The threshold question is whether the Regional Director's action comes within the ambit of the Administrative Procedure Act under which this Court can exercise its review. Without question the OEO Report is governmental action within the purview of this Act. The Economic Opportunity Act expresses no language that Congress intended to prohibit review of OEO actions. The complaint in this case sufficiently states allegations that the OEO Report adversely affected the plaintiff personally and that OEO acted contrary to the law. The Regional Director has contended that the Report was "committed to agency discretion," and that he did not ex-

ceed his authority, even though Congress and the Supreme Court have indicated that the exception to review because of agency discretion is a narrow one. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); S.Rep.No. 758, 79th Cong., 1st Sess., 26 (1945). The claim of exemption for agency discretion is one which does not preclude court review when there are laws which apply to the action taken. Clearly, Congress and the OEO itself have laid down rules and regulations upon which this Court can weigh the Director's action and therefore the discretionary function exception is inapplicable in this case.

■ The determination of the right of review leads the Court to a consideration of the scope of review and the standards which it must apply. The present court review is not the typical administrative review situation. In this action, we are not considering an agency adjudicatory proceeding or a formal record of findings and conclusions. The present case involves review of an agency evaluation report which was based on evidence and opinions of numerous subordinates of the Regional Director. Yet despite this unusual use of the provisions of the Administrative Procedure Act the Court can examine the Report under the standards set down in section 706. The Court can set aside the OEO Report if the preparation and decision of the Report is "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law" or if the action fails to comply with statutory and procedural requirements or is "unwarranted by the facts." 5 U.S.C. § 706(2)(A)(B)(C)(D)(F).

The Supreme Court in Citizens to Preserve Overton Park, Inc., v. Volpe, *supra*, considered the scope of review of institutional decision-making. The Court stated that the reviewing Court must decide whether the agency acted pursuant to statutory authority; whether the decision of the agency is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; and whether the agency adhered to the procedural requirements. 401 U.S. at 415–417, 91 S.Ct. 814 at 823–824.

The statutory authority for making and issuing the OEO Report rests in the Economic Opportunity Act. Section 233 of the Act, 42 U.S.C. § 2826, provides that the Director shall evaluate the programs, "including their effectiveness in achieving stated goals, their impact on related programs, and their structure and mechanisms for the delivery of services." In addition, the Director is charged with responsibility for setting administrative standards for the operation of community action agencies. Section 213, 42 U.S.C. § 2796, states that the local agencies shall follow the "standards of organization, management and administration" which will achieve the goals of the Act. Furthermore, Congress has directed the Director to carefully scrutinize agencies for fiscal responsibility and operating efficiency. Under section 243, 42 U.S.C. § 2835, the Director has the discretion to "take such actions as he may deem necessary and appropriate . . . to insure fiscal responsibility and accountability, and the effective and efficient handling of funds in connection with programs assisted" under the Act.

The plaintiffs do not contend that the OEO has no authority to make evaluations. They contend, however, that the Regional Director violated the clear intent of Congress and the dictates of the agency's own regulations in carrying out the evaluation. In particular, the plaintiffs contend that the OEO has abridged the fundamental tenet of the Act, that is, participation of the poor in the "planning, conduct and evaluation of programs which affect their lives." OEO Instruction No. 6005–1 (Dec. 1, 1968). Moreover, the plaintiffs declare that the OEO has exceeded its authority by unilaterally dictating the restructuring of the DCCAC and the consolidation and elimination of certain programs created by the poor and approved by the local board. By threatening termination of the program unless the DCCAC adopted the or-

ders of the OEO, the OEO usurped the right of the poor to organize their own programs. The direction of the OEO called for centralization of all control in the DCCAC board and dictated the implementation of a "decentralization" program which was prepared by the DCCAC staff. The Report directs that power and authority should be taken away from neighborhood organizations and returned to the DCCAC.

The laws and regulations are indeed clear that the poor people participating in the anti-poverty programs are to have a voice in its operation. This intention is clear from the express goals cited by Congress in the Act and the OEO's numerous guidelines. OEO Instruction 6347–01 (Memo No. 41, June 29, 1966) crystallized the objective of neighborhood participation in war on poverty programs as follows:

"The second sentence of Section 211 (c) of the Act contemplates that neighborhood-based organizations composed of residents of areas and members of groups served by the community action program will play an important role in assisting the community action agency to plan, conduct and evaluate components of the program.

"OEO encourages community action agencies to make the fullest possible use of neighborhood-based organizations. While these 'grass-root' organizations do not possess all the powers of area policy boards, they have a vital role to play in community action . . . .

"One important measure of the success of community action agencies will be the extent to which they entrust genuine program and policy-making responsibility to neighborhood-based organizations and insure through those organizations that the poor are able to influence the character of their community action programs."

OEO Instruction 6005–1 considered the participation of the poor in the activities of the anti-poverty programs. In this document the OEO relates its policy toward target area organizations and their role in the war on poverty.

"To strengthen the voice of poor people in the decisions which affect them and to increase the participation of poor people in the community action process, each CAA is expected to recognize or help establish target area or neighborhood-based organizations and to negotiate with them regarding their role in CAA-sponsored programs. The CAA must provide adequate support, guidance, training, and technical assistance to such organizations to help them become effective spokesmen and to attract additional resource from public and private sources." Id. at 7.

Thus the overriding theme of the war on poverty program is self-help, neighborhood control, and decentralization of functions. The OEO has declared that these goals are, in fact, rights of the poor. In a summary of OEO Instruction 6005–1, the OEO affirmed that poor people have the right to:

"Organize themselves into workable and responsible neighborhood or target area groups to take action on problems and issues of poverty *that concern them* and to be given help (technical assistance, training, staff assistance and funds where possible) by the community action agency to strengthen their ability to act effectively to erase poverty."

Against this background of clear expression of the objectives of the OEO program, the plaintiffs charge that the Regional Director exceeded his authority by ordering the adoption of the recommendations and conclusions of the April 7, 1972 Report. The OEO was retreating from the goals which they were commissioned to sponsor.

This Court finds that the delineation of the scope of the Regional Director's authority to issue the order to the DCCAC to implement its recommendations and "corrective actions" or face termination of all funding to be ambiguous under the Act. There is no ex-

press mandate from Congress that the Director can dictate how the local programs are to be run. Yet the Act does give the Director the power to set standards for efficiency and fiscal responsibility and to pass upon grant applications. Sections 233 and 243 of the Act, if not expressly, at least impliedly grant the Director the power to take affirmative action to correct organizational inefficiency and fiscal irresponsibility. It is reasonable to assume that Congress intended that the Director should have the right to withhold funds from community action agencies which failed to operate according to the standards. The plaintiffs, however, contend that the Director's action in the instant case exceeded the authority given by Congress because the action was in direct conflict with the fundamental goals of the OEO. In addition, they contend that the Director has invaded an area which is the exclusive province of the local functionaries and board by ordering that the "specific reforms and corrective action outlined in the monitoring report must be implemented." Many of these "reforms" called for changes in the programatic operations of the project. The plaintiffs construe this action as intruding on an area which Congress has committed to local control.

Section 221(e) of the Act precludes the Director from establishing "binding national priorities on funds authorized" under the Act because Congress wanted "to promote local responsibility and initiative." Although the intent of Congress is clear with regard to entrusting the determination of goals and their implementation with the local community action agencies, Congress did not release all control over the anti-poverty funds to the local boards. Section 221(d) provides that "the Director shall require, as a condition of assistance, that each community action agency has adopted a systematic approach to the achievement of the purposes of this subchapter and to the utilization of funds."

 The scope of the Director's authority and discretion is subject to the overriding congressional intent of the Economic Opportunity Act. In the Act, however, Congress has given the Director power to evaluate programs and to approve funding. Under this authority, it is reasonable to infer that the Director has the right to direct the preparation of the report and to require its adoption as a condition for funding. This Court is, of course, deeply concerned with the apparent conflict between the Congressional mandate to the poor people to operate their own programs and the Director's power to withhold all funding unless the programs are run as he directs. Considering the exigencies of the situation, however, this Court cannot find that the Director did not properly construe his authority to take the extraordinary action called for by this Report. In this Court's opinion, the facts as presented at trial evinced sufficient cause for the Director to reasonably believe that the remedial action prescribed was "necessary and appropriate" to preserve the program. 42 U.S.C. § 2835(d). Although there may be variation and conflict between the stated objectives of the Act and the conduct of the Regional Director, the action of the Director is not precluded by the Act and any variation from the stated policy of the OEO was for good cause and thus this Court cannot overturn this decision of the Director. Couch v. Udall, 404 F.2d 97, 99 (10 Cir. 1968).

Having decided that the Regional Director acted within the scope of his authority, the Court is faced with the question of whether the Report is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unwarranted by the facts." 5 U.S.C. § 706(2)(A)(F). In addition, the Court must decide whether the conclusions "reasonably may be based upon the facts proven." Radio Officers' Union v. NLRB, 347 U.S. 17, 49, 74 S.Ct. 323, 340, 98 L.Ed. 455 (1954).

The plaintiffs have charged that the Regional Director deliberately and arbitrarily focused on TACC and its members in criticizing the DCCAC programs.

They challenged the motivation of the OEO in attacking this segment of the program and in generally projecting a negative tone about TACC's efforts in the community. The evidence did reveal instances of incorrect information being included in the Report. Charges of conflicts of interest directed against Stanley Gaines were found to have been cleared by the OEO prior to the issuance of the Report. The danger of receiving incorrect information is acknowledged in institutional decision-making where the Director relies on many subordinates. Precisely for this reason, institutional decisions of the magnitude of the instant Report demand close scrutiny. In addition, the haste with which the monitoring team did its work and produced the Report increased the chances for error and inconsistencies and therefore called for careful review.

The testimony and documentary evidence did not, however, display any clear error of judgment by the Director. The testimony of the monitoring team was not less credible than the opposing evidence. Victor Products Corp. v. NLRB, 93 U.S.App.D.C. 56, 208 F.2d 834, 839 (1953). Absent a clear showing of bad faith or improper behavior, this Court will not inquire or speculate on the motivations or mental processes of the decisionmakers. United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed 1429 (1941). The evidence did not raise any question of improper behavior which would have caused the team to purposefully single out TACC or its members for critical review. As heretofore stated the Report and the action of the Director were not arbitrary, capricious, an abuse of discretion, contrary to law or unwarranted by the facts.

▪ The plaintiffs have raised the question that the Regional Director has violated the procedural requirements of the OEO regulations and minimal constitutional safeguards. The plaintiffs contend that the OEO violated its own procedural guidelines by not properly eliciting the views of the program participants. According to OEO Instruction 6005–1, the poor people have a right to be consulted in the evaluation of agency programs and operation. Plaintiffs charge that the monitoring team did only a superficial job in complying with this requirement. The evidence, however, does indicate that poor persons were interviewed about the matters which were the subject of the findings of the Report. It is not for this Court to inquire into the effectiveness or completeness of the interviews.

▪ Plaintiffs also contend that they have been denied the right of appeal granted by the act and OEO regulations. Section 604 of the Act directs the Director to prescribe procedures for appeals by persons and organizations "which would like to serve as a delegate agency." OEO Instruction No. 6441–1 (Mar. 14, 1972) provides the regulations for processing and considering the appeals. In addition, OEO Instruction 6005–1 provides for appeals of grievances which the poor people have concerning the antipoverty programs. This instruction directs appeals to the local board which has the responsibility for notifying the Regional Office of its action. In addition, OEO Instruction 6005–1 provides that

"poor people, either as individuals or groups, are encouraged to continue to express themselves directly to OEO Regional Offices and Headquarters if they have complaints about the operation of OEO-funded programs." Id. at 12.

The OEO takes the position that they have not received any appeal from the issuance of the Report. The Regional Director and his assistants reported that they had received numerous letters concerning the Report which to them did not constitute an appeal. Moreover, there has been referred to them from the national office, letters which the plaintiffs had sent to the President and Director of the OEO. To date, the Regional Office has neither responded to these in-

quiries nor conducted hearings on the complaints. The Regional Director's only response has been to report that the questions are under consideration.

The OEO's contention that it is under no obligation to consider the plaintiff's appeal because the notice did not conform to the regulations is untenable in the face of the wide and varied complaints and notices to OEO, including one petition with over a thousand names. Notices of appeal should be liberally construed. Jones v. Chaney & James Construction Co., 399 F.2d 84 (5th Cir. 1968). These persons deserve a reply with reasonable promptness.

■ The government has argued that if the plaintiffs are entitled to appeal from the decision of the Regional Director, then the present hearing is sufficient and should satisfy their due process rights. The Court must reject this argument, however, because, as has been amply stated in this opinion, this Court has a limited scope of review and is even more limited in the remedies which it may grant to the plaintiffs. The Regional Director is the person who has the power to grant the plaintiffs the affirmative relief they desire. It is the recommendation of the Court that the Regional Director be more responsive to the complaints of the poor and respond with dispatch to their appeals.

Having found the remedy which the Court can take is limited to finding the Report void and ordering another evaluation and having found that the Report and the action of the Director are not arbitrary, capricious, an abuse of discretion, contrary to law or unwarranted by the facts

It is therefore ordered, adjudged and decreed that the Plaintiffs and Intervenors be and are hereby denied any relief, and that they take nothing and that the Defendants go hence with their costs.