**NATIONAL NUTRITIONAL FOODS ASSOCIATION and Solgar Co., Inc., Plaintiffs,**

v.

**F. David MATHEWS, Secretary of Health, Education and Welfare and Alexander M. Schmidt, Commissioner of Food and Drugs, Defendants.**

**No. 73 Civ. 3348.**

United States District Court, S. D. New York.

July 2, 1976.

Bass, Ullman & Lustigman, New York City, for plaintiffs; Milton A. Bass, Jacob Laufer, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty., New York City, for defendants; Naomi Reice

Buchwald, Asst. U. S. Atty., New York City, Stephen H. McNamara, Assoc. Chief Counsel for Food of the U. S. Food and Drug Administration, Washington, D. C., of counsel.

## OPINION

FRANKEL, District Judge.

This case, on remand now "to conduct an *Overton*-type hearing," *National Nutritional Foods Ass'n v. Weinberger,* 512 F.2d 688, 703 (2d Cir.), *cert. denied sub nom. National Nutritional Foods Ass'n v. Mathews,* 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975), was brought in August of 1973, seeking declaratory and injunctive relief against regulations of the Food and Drug Administration requiring that preparations of Vitamins A and D in excess of 10,000 IU (international units) per dosage unit and 400 IU per dosage unit, respectively, be restricted to prescription sale, and that such vitamins be labelled accordingly, 21 C.F.R. §§ 250.109 and 250.110 (1976). Plaintiff's motion for a preliminary injunction was denied on September 25, 1973, 366 F.Supp. 1341 (S.D.N.Y.), aff'd, 491 F.2d 845 (2d Cir. 1973), and the regulations became effective on October 1, 1973. Defendants' subsequent motion for summary judgment was granted, 376 F.Supp. 142 (S.D.N.Y.1974), a decision which has been, as noted, vacated and remanded. Moving at a rather leisurely pace, the parties have now submitted additional materials and arguments, supplementing those already before the court from the two previous motions. For the reasons hereinafter outlined, the regulations are upheld as not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and the complaint will be dismissed.

## I.

A couple of procedural issues are presented at the threshold. Plaintiffs argue, on principle and under the terms of the mandate of the Court of Appeals, that Commissioner Schmidt should be subjected to cross-examination concerning the grounds on which he classified high-potency Vitamins A and D products as "drugs." In addition, there is a question as to the scope of the "record" upon which the court should make its determination. On both subjects, the court is in disagreement with plaintiffs' position.

■ A. "The great developer is responsibility."[1] That familiar bit of Brandeis wisdom remains vital. Time and travail, even Watergates, should and must not close it from our minds. There may be imaginable occasions when judges ought rightly to summon high agency officials to undergo cross-examination about the legislative premises underlying their formally published rules. There may even be occasions when legislators could be commanded to do likewise. But the instances would surely be rare, marked by circumstances of some extraordinary character.

An *Overton*-type hearing is not an open invitation, much less a direction, to cast aside this familiar learning, recognized for administrative decisionmaking since *United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941). The case for which the present "hearing" is named recognizes, first, the limited circumstances in which the administrator's mind may be probed by examination, and, second, the discretionary nature of such an examination even when the exceptional circumstances have been met. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420–21, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); see also *Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).[2] The Court of Appeals demanded no more in this case, 512 F.2d at 703 ("including such affidavits or testimony as to the Commissioner's reasoning as the court deems necessary").

1. Letter from Louis D. Brandeis to Robert W. Bruce, February 25, 1922, in Richberg, *The Industrial Liberalism of Justice Brandeis,* 31 Colum.L.Rev. 1094, 1099 (1931).

2. See Pedersen, *Formal Records and Informal Rulemaking,* 85 Yale L.J. 38, 50 (1975); cf. *Dunlop v. Bachowski,* 421 U.S. 560, 565–66 n.6, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975).

In this light, the court requested, and received an affidavit from the Commissioner. Plaintiffs have pitched various arguments against the affidavit, and these have been considered. Their contention that they are entitled to more—entitled to cross-examination the Commissioner as well—is unfounded as a matter of law, and unsupported, insofar as it is a matter of discretion, by any demonstration of great necessity. The niceties of the Administrative Procedure Act were nowhere neglected in this case. The indicia of due notice, full deliberation, and general regularity are all present. There is nothing so irregular or peculiar as to justify the expedient of having the agency head grilled on the witness stand about what he thought he knew, what he now thinks he believes, and how he may have reasoned, in making the mixed judgments of fact, policy, and law which underlay the decision to define these high-potency vitamin pills as "drugs."

B. The question about the "record" is narrower, and still less gripping. The record originally before this court consisted of the materials produced by the "notice and comment" provisions of the Administrative Procedure Act—to wit: (1) the official notices by the F.D.A., with cited reference materials incorporated by reference; (2) the voluminous comments, some 45 folders full, received in response; and (3) the promulgated rules and their published explanations. The agency contends that this satisfies the proper definition of the record.[3] Even so, in a spirit of accommodation, the Commissioner has now placed before the plaintiffs and the court other material found in his files, namely, correspondence with third parties antedating the proposed regulations and postdating the final regulations, a few additional medical articles, and five other "miscellaneous" pieces of paper. The only items withheld from plaintiffs are a sheaf of some two dozen papers, all consisting of internal F.D.A. memoranda or proposed drafts of the original notice.[4]

█ Plaintiffs press for these papers as well, contending that they should be treated as a part of the agency record.[5] The contention is not persuasive. What plaintiffs seek are presumptively privileged documents, whose privacy is left untouched by the Freedom of Information Act's exemption from disclosure for "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency," 5 U.S.C. § 552(b)(5). There is no reason to think that the need to compile a "record" for a judicial review proceeding makes this limitation inapplicable, especially in light of the general proscription against probing the mind of the administrator. And there is, in any event, no showing of justification for the kind of invasion plaintiffs propose.

In short, the material now before the court and the agency, supplemented, as it is, by the voluntary production by defendants of all non-privileged documents, has given plaintiffs all, and probably more, than they are entitled to have as the administrative record for judicial review of informal agency rulemaking. See *Rodway v. United States Dept. of Agriculture,* 168 U.S.App. D.C. 387, 514 F.2d 809, 817 (1975); *Phillips Petroleum Co. v. F.P.C.,* 475 F.2d 842, 850 (10th Cir. 1973), cert. denied, 414 U.S. 1146, 94 S.Ct. 901, 39 L.Ed.2d 102 (1974); *City of Chicago v. F.P.C.,* 147 U.S.App.D.C. 312, 458 F.2d 731, 740–41 n.45 (1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972); *Automotive Parts & Accessories*

---

3. A "Supplemental Record # 1" has been produced, consisting of a few additional letters and a couple of memoranda to files which defendants acknowledge probably should be considered a part of the record.

4. These have been examined by the court to ascertain whether they are fairly and accurately characterized as intra-agency communications and prior drafts. The court so finds.

Government counsel will be expected, of course, to keep the documents submitted *in camera* for further inspection, if necessary, by the Court of Appeals.

5. Plaintiffs have also demanded discovery to see what else may exist in the agency files. The demand has been denied.

*Ass'n v. Boyd,* 132 U.S.App.D.C. 200, 407 F.2d 330, 336 (1968); see also *National Petroleum Refiners Ass'n v. F.T.C.,* 392 F.Supp. 1052, 1053 (D.D.C.1974).[6]

## II.

The central substantive question to be examined on this remand is whether or not the Commissioner's classification of high-dosage preparations of Vitamins A and D as "drugs" within the Food and Drug Act's statutory definition, § 201(g)(1), 21 U.S.C. § 321(g)(1), was "arbitrary, capricious or otherwise not in accordance with law." The start of our inquiry, the statutory definition of a drug, reads, to the extent relevant:

"The term 'drug' means (A) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals * * *."

With respect to whether the record supports the classification of high-dosage preparations of Vitamins A and D as drugs, the focus in these proceedings has been on subsections (A) and (B) of the definition.

■ Respecting subsection (A), both sides recognize that the intervening decision in *National Nutritional Foods Ass'n v. F.D.A.,* 504 F.2d 761, 788–89 (2d Cir. 1974), cert. denied, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975) precludes any simple reliance on the presence of an item in the official United States Pharmacopoeia or the official National Formulary: "the argument would prove too much, for it would lead to the conclusion that all vitamin and mineral preparations even within the limits are drugs * * *." Not accepting this as the end of the matter, the Commissioner, in his affidavit, counters by arguing:

"Unlike most articles recognized in the U.S. Pharmacopoeia and the National Formulary, which are included because of therapeutic usage, vitamins A and D are specifically recognized in the U.S.P. and N.F. for prophylactic (food) usage as well as for therapeutic (drug) usage. In my judgment, while the Act provides that an article is deemed to be a drug if 'recognized' in the U.S.P. or N.F., a vitamin preparation should nevertheless not be classified as a drug on this basis with respect to a usage which is specifically recognized by these compendia to be a prophylactic (food) usage. Consistent with this principle, the vitamin preparations subject to the regulations *exceed* the levels of potency recognized as 'prophylactic' in the United States Pharmacopoeia and National Formulary * * *." (Emphasis in original.)

The argument has weight, for otherwise it is unclear what force would remain of subsection (A) of the definition. It appears, however, to be a new thesis, not evident to justify the regulations as originally promulgated. If this were all the Commissioner had, his position could be highly vulnerable. It would appear to suffer the fatal disorder of *post hoc* rationalization. Cf. *National Nutritional Foods Ass'n v. FDA,* 504 F.2d at

---

6. The bulk of the legal writing views the record in review of informal rulemaking as consisting of the agency's initial proposal, with supporting material, the comments received, and the final rule. See Pedersen, *supra,* 85 Yale L.J. at 64–66, 75–76; Wright, *The Courts and the Rulemaking Process: The Limits of Judicial Review,* 59 Cornell L.Rev. 375, 395 (1974); Hamilton, *Procedures for the Adoption of Rules of General Applicability: The Need for Procedural Innovation in Administrative Rulemaking,* 60 Calif.L.Rev. 1276, 1333–34, 1336 (1972); Note, *Judicial Review of the Facts in Informal Rulemaking: A Proposed Standard,* 84 Yale L.J. 1750, 1752–53 n.16 (1975). A recommendation of the Administrative Conference of the United States is a bit broader, 1 C.F.R. § 305.-74–4(c)(1) (1976). The material submitted by defendants fulfills the broader view, with the exception of "factual information not included in the foregoing * * * that is proffered by the agency as pertinent to the rule." As for this, which would smack of post hoc rationalization if it were submitted, the plaintiffs do not contend for it. See also Pedersen, *supra,* at 65.

788–89. However, the court finds enough that is valid and substantial to sustain the agency.

The bulk of the contentions concerning the validity *vel non* of the decision to classify the affected preparations as drugs has focused on subsection (B) of the definition. The course of decision is guided by the decision of the Court of Appeals, which stated, 512 F.2d at 703:

> "Upon adoption of the regulations the Commissioner stated that since there was no evidence that the higher dosage levels were used for nutritional purposes except for use of Vitamin D by a limited number of persons with poor Vitamin D absorption needing up to 1,000 IU daily, they 'are therefore appropriate only for therapeutic purposes and thus properly classed as drugs.' As Judge Friendly said, 'demonstrated uselessness as a food for most people' would not automatically establish that the higher levels qualify as a 'drug' within the definition in § 201(g)(1). The statute requires a finding of intent that a product be used for therapeutic purposes, and the Commissioner made no such finding. However, in his earlier statement proposing the regulations here under review the Commissioner stated that 'there is widespread promotion to the laity of excessive quantities of these vitamins for prophylaxis and treatment of a variety of diseases and disorders.' This statement indicates that the Commissioner, upon promulgating the regulations, may not have fully stated his reasons for classifying the higher levels as drugs. It is conceivable, for instance, that the Commissioner had before him information demonstrating that the higher dosage forms were used almost exclusively for therapeutic purposes. Measuring intent on an objective basis, as it must be, he may have concluded that in view of the extremely small percentage used for nutritional purposes Vitamins A and D at higher dosage levels were intended for use in the 'cure, mitigation, prevention or treatment of disease.' In that case his action could hardly be arbitrary or capri-

cious and the regulations could, consistently with *NNFA v. FDA,* be upheld."

Proceeding in this light, an examination of the record, together with the affidavit of Commissioner Schmidt, demonstrates that the classification of high-potency preparations of Vitamins A and D as drugs was not "arbitrary or capricious," and, accordingly, must be upheld.

In the first place, the Commissioner found "on the basis of all the available evidence, that vitamins between the upper and lower limits as specified in § 80.1 are adequate for all known nutritional needs for normal individuals * * *." He further noted that "[n]o evidence was submitted in the comments to establish a food or nutritional use of vitamin. A or vitamin D at higher levels, except for a limited number of persons with poor vitamin D absorption who need up to 1000 IU of this vitamin [and for whom an exception is made in the regulation]." After an examination of the record, these findings appear neither arbitrary nor capricious. It was, to be sure, noted in *National Nutritional Foods Ass'n v. FDA,* 504 F.2d at 791, quoting the NAS 1974 edition of Recommended Dietary Allowances, that:

> "RDA are estimates of 'acceptable daily nutrient intakes' in the sense that, although the needs of most individuals will be less than the RDA standard, there may be a small number who require more. . . . It is not possible to be more explicit about the relationship between RDA and the requirements of an individual; thus, it is only within the framework of statistical probability that RDA can be used legitimately and meaningfully."

However, as a matter of sufficient "statistical probability," the Commissioner's conclusions withstand plaintiffs' assault. Meaningful studies, relied upon in the record, indicate that, at least for vitamins A and D, the RDA levels *are* adequate for virtually all healthy people, and "[e]xcept in situations of impaired fat absorption * * * should not be exceeded," Oliver, *Chronic*

*Vitamin A Intoxication,* 95 Am.Jr. Dis.Child 57, 67 (1958).[7]

Moreover, as the Commissioner stated in the supporting commentary to the regulations, the record contains no affirmative evidence of nutritional usefulness for anyone above the levels dealt with in the regulations, while the evidence does reveal extensive therapeutic uses for these high-potency preparations. Furthermore, the methods of distributing the products makes clear they are addressed to a mass market, not to the rare few with exceptional nutritional needs.

■ In sum, the record supports a finding that the high-potency preparations in question have no demonstrated usage as a food, at least for all but an "extremely small percentage" of the population, above the levels established in the regulations. While, in light of *National Nutritional Foods Ass'n v. FDA,* 504 F.2d at 790–91, this factor alone may not be sufficient to save the regulations from attack, it is certainly a relevant and important datum in the Commissioner's favor. As the Commissioner stated in his affidavit, "much more than 'demonstrated uselessness as a food for most people' is involved in the drug determination in the present vitamin A and D regulations. * * * These high potency vitamin A and D preparations provide excessive amounts of the vitamins which are useless as a food for virtually anyone * * *."

It is noted, further, in examining "objective intent," that the Commissioner's support of his regulations does not stop with simply a showing of uselessness as a food for virtually all people. The Commissioner, in his earlier statement proposing the regulations, stated that "there is widespread promotion to the laity of excessive quantities of these vitamins for prophylaxis and treatment of a variety of diseases and disorders." That statement, while it probably is supportable simply on the basis of the Commissioner's own knowledge from experience, *Consumers Union of United States, Inc. v. Consumer Product Safety Comm.,* 491 F.2d 810, 812 (2d Cir. 1974); *Chemical Leaman Tank Lines, Inc. v. United States,* 368 F.Supp. 925, 940 (D.Del.1973), also finds support in the record material before the Commissioner when he made his decision. Articles, both in the medical and the popular press, have advocated the taking of Vitamins A and D in large quantities to cure diverse ills from acne to night-blindness. See, e. g., American Academy of Pediatrics, Newsletter, Vol. 23, No. 9 (June 1, 1972) ["The use of high doses of vitamin A (25,000 to 50,000 units/day) has been recommended, by Adelle Davis in the lay press, on radio, and on television."] The finding of widespread promotion of high-dosage preparations in the treatment and prevention of disease is also supported, as a matter of rational inference,[8] by the vast numbers of comments received on the proposed regulation from people who desire to continue the

---

7. See National Academy of Sciences, Food and Nutritional Board, National Research Council, *Recommended Dietary Allowances* ("long experience has shown that 400 IU/day are sufficient to meet the [Vitamin D] requirements of practically all healthy individuals, assuming no exposure to ultraviolet light"). See also AMA Drug Evaluations, 2d ed. (1973) at 153–55:

"The Recommended Dietary Allowances (RDA) for individual vitamins established by the Food and Nutrition Board of the National Research Council provide authoritative information to assist the physician in evaluating the formulas of multivitamin preparations * * *. These allowances, shown in Table 1, represent amounts that will maintain good nutrition in practically all healthy persons, and are usually considerably greater than the Minimum Daily Requirements (MDR) established by the Food

and Drug Administration for labeling purposes * * *.

"It is often assumed that a dietary intake of less than the Recommended Dietary Allowance by itself indicates substandard nutrition or even a deficiency. There is no justification for such a belief. In the 1968 edition of its publication, Recommended Dietary Allowances, the Food and Nutrition Board states:
  ' * * * Since the RDA are designed to be adequate for practically all of the population of the United States, *they allow a margin of safety for individual variations.*' " (Emphasis added).

8. Cf. *United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 749, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972); *Gaines v. Martinez,* 353 F.Supp. 780, 790 (N.D.Tex.1972).

taking of the high-potency vitamin preparations for, *inter alia,* hay fever and prevention of colds or infection,[9] as well as by the scholarly literature reporting similar widespread beliefs among the laity. See, e. g., Gerber, Raab & Sobel, *Vitamin A Poisoning in Adults,* 1954 Am.J.of Med. 729.[10]

■ This public promotion of high-dosage quantities of Vitamins A and D for the "cure, mitigation, treatment, [and] prevention" of a variety of ailments, when coupled with the fact that there exists little, if any, evidence of known nutritional requirements beyond the limits imposed in the regulations, justifies the conclusion that the classification as drugs of high-dosage preparations of Vitamins A and D is neither arbitrary nor capricious, and must be sustained.

■ Once classified as drugs, these preparations may be denominated prescription drugs, 21 U.S.C. § 353(b), in view of the substantial evidence of their possible toxicity in high-dosage quantities. *National Nutritional Foods Ass'n v. Weinberger,* 512 F.2d at 704. The remaining issues have already been disposed of in the prior proceedings in this case. An examination of the record, the affidavits, and the parties' arguments leads to a ruling that the promulgated regulations are not arbitrary, capricious, or otherwise subject to attack.

The complaint is dismissed. So ordered.

### APPENDIX

*Folder # 28*

Letter, Mrs. Leslie W. Boodry, Feb. 5, 1973: "For over 40 years I have had food allergy problems. Having studied Adelle Davis's books and thus supplementing my diet with one of the B vitamins, namely Pantothenic Acid, I have been able to eat without any reactions or side effects, all of the many foods which previously were not tolerated by my body."

---

9. Selected comments, from two folders (# 28 and # 35) are reprinted in an Appendix, *infra.*

10. This article noted not only that "[l]arge doses of vitamin A are used in the treatment of skin, eye, renal, gynecologic and ear disorders as well as the common cold," but also that

Letter, Herbert Shapiro, Feb. 4, 1973: "I have been successfully using vitamin A (25,-000 units per day) for the past 10 years. 10 years ago I was a very sick person—one infection after another and I believe the vitamin A & C has helped greatly."

Letter, Marion Cotton Whitcher, Jan. 29, 1973: "Why do you suppose 7,000,000 copies of Adelle Davis' book have been sold? Why do you suppose health food stores are springing up all over the country? * * * [B]ecause Adelle's suggestions work, that's why. People use vitamins and natural foods and their health improves. The ill become well often to the surprise of their doctors."

Letter, Corry Duda, Jan. 31, 1973: "From personal experience, a friend had terrible menstrual cramps every month for years; sometimes passing out from the pain. * * We read 'Lets Get Well' by Adelle Davis and tried for a month calcium tablets and 25,000 units of Vitamin D daily. Not only did all her pain subside but she did not have the slightest toxic sympton [*sic*]."

Letter, Brenda Walton, Feb. 5, 1973: "there are so many more of us who depend on these supplements as daily insurance of sustaining good health and combating disease. * * * "

"The endless wonders food supplements have performed (such as curing numerous serious illnesses, sustaining health . . & etc.) far outweigh the temporary harm they may have caused to a few thoughtless users."

Letter, Jan Meridith, Feb. 2, 1973: "My elderly Mother after two broken hips and several crushed vertebra is able to walk again due to natural vitamins. My diabetic Father is now able to live, and eat a rather normal diet without medication due to his intake of multiple vitamins."

Letter, Mrs. Joyce A. Douglas, Feb. 6, 1973: "I have taken as much as 300,000 units of A

"[s]elf-medication with vitamin concentrates containing large doses of vitamin A is a common occurrence due to the general belief by the laity that vitamins improve health and increase resistance to infection." Id. at 737, 744.

**402**

APPENDIX—Continued

a day for two months * * *. This I did to rid myself of an infection I had for 9 years, on and off. * * * I have given my children 50,000 units of A a day for a few days for colds and flu. * * * "

"* * * I am a follower of Adelle Davis. And if the people of the FDA would read her books and practice what she says they would laugh at this limit on A & D they want."

Letter, Pearl Stanford, Feb. 1, 1973: "There is a growing number of people in America who are becoming informed through T.V., Radio, and Scientific publications, and there are organizations who work to make scientific facts available to the public. Long before the Vitamins were known or named, Cod Liver Oil was known for its healing powers."

Letter, Mrs. Susan Gilson, Jan. 31, 1973: "If my children are ill, I have given them 25,000 units of vitamin A for a short time with vitamin E to help them combat the infection."

Letter, Larah H. Waszink, Feb. 8, 1973: "In the United States with competent advice from M.D.'s and the great nutritionist Adelle Davis I got rid of the arthritis with large doses of A, D, C, B, E, etc."

Letter, Mr. & Mrs. Tom F. Marunich, undated: "Some of the attributes of Vitamin A are,—clearing up ear aches, sore throats, vaginal infections, strengthening ones vision, clears acne, helps remove warts, gum infections, applying this vitamin to wounds and burns helps heal unbelievably fast not to mention other things."

"Some of the attributes of vitamin D are,—helping to relieve menstrual cramps, * * * relieves nervousness, irritability * * * "

Letter, Mrs. Edward Button, Feb. 5, 1973: "If it wasn't for Vitamin A my face would have been covered with warts. Doctors wanted to give me a strong medicine (which is known to destroy the blood cells) but instead I found an article saying that Vitamin A had been known to dissolve warts."

Letter, Mrs. Frances Hale, Feb. 9, 1973: "Adelle Davis on p. 372 of 'Let's Get Well'

says, 'When 300,000 units of vitamins A and 1,000 milligrams of vitamins C were given daily for three to six months to 218 cases of inoperable cancer, the malignancies regressed in size or remained stationary.' "

"* * * I then read Dan Dale Alexander's book on 'Arthritis and Common Sense.' I started taking codliver oil. I took bottles of the stuff. I also took over doses of a multi-vitamin preparation."

*Folder # 35*

Quote in a letter, from Virginia Elenbaas, December 15, 1972, ostensibly from the Grand Rapids Press: "Heavy promotion of both Vitamins A and D for the treatment of acne, night blindness . . . neither is proven effective for these conditions in well nourished people."

Letter, signature cut off in copy, Jan. 3, 1973: "I myself have taken 100,000 I.U. of vitamin A every day for months and my problems are cleared up in many ways. * * * "

"* * * And I may say I have proved that taking large amounts of Natural food supplements has kept me from having colds, flu and various different ailments that people come in to my store with."

Letter, Martha Bevis, Jan. 22, 1973: "Our 5 year old was born also with asthma and an eye problem which has been helped with vitamins. I give him a minimum of 25,000 units of A and 2,500 of D every day. Then every few months I give him 50,000 units a day for a while. The pediatrician I did have said vitamins couldn't possibly help anyone. My answer to him was 'If you will look at my bills, you will see that I'm not coming in with sick children anymore, because I don't have sick children since we started on vitamins.' "

"* * * Drs. Cheraskin and Ringsdorf at the University of Alabama have written of tremendous success treating all kinds of diseases through nutrition and vitamins . . . 'New Hope for Incurable Diseases.' "

APPENDIX—Continued

Letter, Mrs. Helen Bibby, Feb. 8, 1973: "I have been taking massive doses of Vitamin A and D for years. (In excess of 125,000 USP Units of A & 2500 USP [units] of D.) I do not wear glasses. I have not been sick for over 5 years. I have not seen a doctor for any illness * * *."

Letter, Mrs. W. C. Jacobs, undated: "Why prevent the Citizens of America from improving their health? From preventing Cancer—or its return, if you've had it?"

Letter, Mrs. Frank Brogan, Feb. 16, 1973: "This [these regulations] means for me the return of backaches, abdominal cramps, or lack of energy in the evening, the inability to kick colds, flu, etc."

Letter, Alandette Fitzgerald, Feb. 2, 1973: "Quite sometime ago, I had an infection I could not shake on my own, so I was constantly relying on anti-biotics. This was not only depressing, but the cost was ridiculous. Then I read about Dr. Linus Pauling's study on vitamin C. After trying his recommended levels of vitamin C, I knew he wasn't awarded the Nobel prize for nothing! I take other vitamins now and so does my family. Needless to say, we are enjoying better health."

Letter, Hester Robinson, Feb. 7, 1973: "Years and years ago a nutritionist (I believe it was E. V. McCollum) demonstrated the value of large amounts of Vitamin A in delaying the aging process. I cured a rash with 100,000 units of Vitamin A daily."

Letter, Margaret Melcher, Jan 25, 1973: "I have for four years taken 30,000 units a day of Vitamin A and found it instrumental in doing away with my allergies."

Letter, Macklin W. Schabitzer, Dec. 16, 1972: "I am 60 years old and I have been taking one (occasionally two) therapeutic multi-vitamin capsules every day for the past 10 years."